[Sac. No. 3497.   In Bank.—January 18, 1924.]

# W. M. WILLIAMSON et al., Petitioners, v. THE RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

[1] PUBLIC UTILITIES — CORPORATIONS — ARTICLES OF INCORPORATION— RESERVATION OF POWER OF EMINENT DOMAIN.—If from its inception a corporation was a public utility, the power of condemnation or the right to acquire property necessary for its corporate purposes was inherent in its public organism from the first, and a reservation of this power in the articles of incorporation was not necessary.

[2] ID.—WATER COMPANY—PURPOSES.—While the avowed purposes in its articles of incorporation do not fix the character of a corporation in its future activities as being a public service corporation, and the additional act of dedication is necessary to the creation of a public use, when the original appropriators of water from a stream, having declared by broad terms that the purposes are to secure the commodity for a consumption or use which cannot be otherwise than to supply a general public use, organize a corporation which in its articles of incorporation declares its purposes to be that of utilizing the water thus acquired for sale, for manufacturing, mining, mechanical, chemical, agricultural, and for general domestic purposes, to be conducted by means of canals flumes, aqueducts, reservoirs, pipes, and other necessary conduits to a vast area of gold-bearing regions, agricultural lands, and to inhabited districts and communities widely separated from each other and to all other places lying adjacent to the route of its main system and its lateral branches, and under such declared purposes establishes a distributing system, and actually furnishes water for mining, irrigation, and domestic purposes in large quantities through a period of many years to thousands of consumers indiscriminately and without refusal to anyone who made application for use of its water for any purposes whatsoever, at rates adjusted to the uses to be made of the water, and apparently held itself in readiness to comply with its declaration of purposes as rapidly as the growth of the communities to which it extends would permit, or has required, it must be held in the absence of countervailing facts that the water was dedicated to public use and that the corporation was a public utility.

[3] ID.—DEDICATION OF WATER TO PUBLIC USE—CONTINUANCE.—If a corporation at its inception, or at any subsequent time, dedicated its waters to a public use, there being no claim that such dedication has at any time since been revoked, said waters have since continued to retain the impress of a public use.

[4] ID.—CONTRACTS—WATER RATES—POWER OF RAILROAD COMMISSION. In this proceeding in *certiorari* to review an order of the Railroad Commission fixing water rates, it is held that the Commission had jurisdiction under the facts to make the order, notwithstanding certain contracts held by the petitioners under which they claimed that the waters in question had always been held in private use and that the corporation owning them was not a public utility.

[5] ID.—RAILROAD COMMISSION — EVIDENCE. — Reception of testimony not strictly within the rules of evidence is not of itself a ground for the annulment of an order or decision of the Railroad Commission, if there is sufficient legal evidence to sustain the order.

[6] ID.—USES OF WATER—CHARACTER OF UTILITY.—In such a proceeding, a table showing the proportion of water furnished a certain town during a brief recent period could not control the entire situation, nor is it proof that the corporation was not prior thereto impressed with the character of a public utility.

[7] ID.—TITLE TO PROPERTY—STATUS OF CORPORATION.—In such a case the title by which the corporation holds its property does not in any way determine its status.

[8] ID. — OMISSION OF SUPERVISORS TO REGULATE CORPORATION. — The omission on the part of the boards of supervisors of counties in which the public utility maintained its system to regulate the same as provided by article XIV, section 1, of the constitution is only a circumstance which was doubtless considered by the Railroad Commission.

APPLICATION for a Writ of Certiorari to review an order of the Railroad Commission fixing water rates. Order affirmed.

The facts are stated in the opinion of the court.

Elliott & Atkinson for Petitioners.

Charles W. Slack and Edgar T. Zook for Respondent Natomas Water Company.

Hugh Gordon and Carl I. Wheat for Respondent Railroad Commission.

SEAWELL, J.—The petitioners are the owners of lands over which one of the branch ditches of respondent Natomas Water Company, known as the valley lateral, and which forms a part of an original system, is constructed, and each of said petitioners is a holder of a water-rate contract en-

tered into by some of the petitioners in the year 1893 and by others in 1894, with the Natomas Vineyard Company, a corporation, predecessor in interest of said respondent.

On January 23, 1922, the state Railroad Commission, upon the application of respondent Natomas Water Company and after hearing duly had, by its order found and determined that respondent was, and its predecessor in interest, to wit, Natomas Water and Mining Company, a corporation, had been from its organization a public utility and the waters served by it and its successors were impressed with a public use, as defined by the laws of this state, and thereupon ascertained the value of respondent's property and established a schedule of rates by which said utility was to be governed in all of its dealings with its consumers and the public in general.

Petitioners, whose contracts stipulate a fixed rate for the use of water and which fixed rate will be increased by the Commission's ruling if permitted to stand, deny here, as they did at the hearing before the Commission, that respondent or its predecessors in interest was, as found by the Commission, a public utility or that the waters in question were impressed with a public use from the beginning or at all. Their claim, on the contrary, is that the waters in question have always been held in private use and the Commission exceeded its jurisdiction in holding upon the facts adduced that respondent was or is a public utility, and the Commission's order is violative of both the state and federal constitutions, which forbid the impairment of the obligation of contracts, the taking of property without due process of law and the deprivation of the equal protection of the law to all persons within the state. The matter is before us for review.

No portion of the Commission's decision other than that relating to said contracts is presented for review and we are, therefore, not required to make an examination of the whole transcript nor of all the exhibits and records.

The original organization, which is now being operated by respondent by the right of succession under another name, is intimately connected with, and is historically inseparable from the early mining activities of the state. The system has its source in a branch of the American River and penetrates the heart of the placer mining district of the

"New El Dorado." That one of the primary purposes of the promoters of the pioneer enterprise was to bring to the aid of the miners a quick and economical method of extracting precious metals from gold-bearing gravels and earth by bank washings, sluicing, and the drift process is sufficiently established by the purposes of the parent corporation as declared by its articles of incorporation and as followed by the actual uses made of the water by miners and others and also by contemporaneous historical events, all of which form a part of the state's history. These are matters of which this court will take judicial cognizance. In addition to the sale of said water for mining purposes it has also been used for viticultural, orchard, farming, and domestic purposes for a period of about seventy years. The head of the canal system was at a point upon the South Fork of the American River, near Rocky Bar, about two miles above Salmon Falls, in the county of El Dorado, and was extended to numerous early-day mining and farming localities.

The original predecessor in interest, the Natomas Water and Mining Company, was incorporated on July 13, 1853, many years before the adoption of our present constitution. Uses were made of said water, however, by means of ditches and aqueducts as early as 1851. The Natomas Water and Mining Company became soon after its incorporation the owner of approximately 17,000 acres of land situate near the town of Folsom, county of Sacramento, and from an early period was engaged in mining said lands. The evidence shows that at least as early as 1876 the main canal had a capacity of 3,500 miner's inches of water measured under an eight-inch pressure in accordance with the methods of that period.

In 1888 the Natomas Vineyard Company was formed and the agricultural lands owned by the Natomas Water and Mining Company were transferred to it. Later, by deed dated November 11, 1893, the title to the canals and water rights passed from the Natomas Water and Mining Company to the Natomas Vineyard Company. The incorporators of the vineyard company were the same persons or the successors of the persons who incorporated the water and mining company and who at the time of the transfer owned and controlled the former. It is admitted that the subsequent corporations were subsidiary to the parent cor-

poration. The purposes of the vineyard company, as set out in its articles of incorporation, were to purchase, acquire, hold, sell, and cultivate lands and real estate; to purchase and sell water and water rights; to engage in agriculture; in the cultivation and sale of grapes and fruits and in the manufacture and sale of wines and liquors; also to engage in the issuance of bonds and other securities and in any and all other businesses incidental thereto and connected therewith in the county of Sacramento. One of the reasons stated by the witnesses for the incorporation of the vineyard company was that the water and mining company was soon to lapse (it then had about fourteen years of corporate existence) and it was necessary to form a new corporation to take over the activities of the old. Another reason assigned for the formation of the new corporation was that "It did not look well for a water company to make and sell wines." Doubtless, the chief reason for the organization of this corporation was to acquire authority by its articles of incorporation to engage in a new enterprise and incidentally to adopt a name expressive of the new industry which was at about that time a growing and important one in this state. The interests of the vineyard company were taken over in 1907 by the Natomas Land and Mining Company. In December, 1908, the latter's interests and holdings were transferred to the Natomas Consolidated of California, a corporation now known as the Natomas Company of California. In March, 1912, the water system, which had been organized about sixty years prior thereto, was transferred, together with all appurtenant and necessary lands, structures, rights of way, and water rights, to the Natomas Water Company, respondent herein, which corporation was formed and controlled by the Natomas Company of California. This completes a complete *résumé* of the order in which respondent's predecessors have come into existence. While the said several corporations differ from the parent body in name there was no substantial difference in the personnel of stockholders or in privities of interests or in the purposes and objects to be accomplished. The primary object of all of the projectors of said corporations was one of general industrial development and as one industry by the law of progression succeeded another in the state's development a new corporation was formed if the old was found to be inadequate to

serve or promote the necessities of a growing section of the state which was undergoing many industrial readjustments and changes.  Mining, which was the original and had long been the principal industry of the country, was becoming largely superseded by the planting of· vineyards and orchards and by general farming and other branches of husbandry.  A fluctuating situation furnishes the reason for the formation of the several corporations which were joined together by the cohesive force of mutual interests.

With this brief review of a situation which affected the several transactions we return to a review of the parent organization and the purposes for which it was created. The articles of incorporation adopted by the first incorporators of the system, to wit, Natomas Water and Mining Company, so far as the question before us is affected thereby, state the purposes and objects to be as follows: "To construct a canal commencing from a point near Rocky Bar, upon the south fork of the American River, about two miles above Salmon Falls, in the said County of El Dorado, and running from thence down the banks of said river, leading waters by means of canals, flumes, aqueducts, reservoirs, pipes and other necessary conduits to the gold-bearing regions, and to the agricultural grounds and inhabited districts in the vicinity of the McDowell Hill, Red Banks, Mormon Island, Willow Springs, Rhodes Diggings, Prairie Diggings, Alder Creek, Negro Bar, Texas Hill, Mississippi Bar, Pennsylvania Flats, and to all other places lying adjacent to the route of said canal or any of its branches and to all such other places as the said water may be conveyed to by said canal, or any of its branches or extensions, for the purposes of using and selling said water for manufacturing, mining, mechanical, chemical, agricultural, or domestic purposes.

"The places of business of said company are to be located at Mormon Island, Willow Springs and Prairie City, all of which places are situated in the said county of Sacramento, and the principal place of business of said company is to be located at Willow Springs, in the township of Natoma, in said county of Sacramento."

[1] It will be seen from the above quotation that said articles of incorporation include practically every known use to which water could at that early period have been devoted.  It is true that the power of eminent domain was

not reserved by express language, but such a reservation was not necessary if the corporation was in fact a utility serving the public, which it unquestionably did in conformity with the powers and privileges conferred upon it by its articles of incorporation. If from its inception it was a public utility, as found by the Commission, the power of condemnation or the right to acquire property necessary for its corporate purposes was inherent in its public organism from the first. The articles of incorporation in the instant case are not open to the criticism made in the case of *Allen* v. *Railroad Commission*, 179 Cal. 68 [8 A. L. R. 249, 175 Pac. 466]. It was there pointed out that the articles of incorporation of the applicant as to its purposes declared that the corporation would acquire its water and water rights "*by purchase and appropriation,*" both methods being wholly within the purview of private ownership of such rights when acquired. "It is not without significance," the court observed, "that there is omitted therefrom the declaration of the right to acquire by condemnation, which right runs only to the public service, and of similar significance is the fact that when this applicant, in the course of its activities, needed to acquire and did acquire certain rights of way, it did not undertake to do so by condemnation, but effectuated its purpose by purchase." The significance given by the court to the omission by the articles of incorporation of the right to acquire certain rights by condemnation, however controlling in view of the facts and circumstances of that case, is greatly weakened, if not entirely destroyed, when considered in the light of the circumstances of the instant case. In the former case the power to acquire certain rights was expressly limited to the sole method of *purchase* and *appropriation*. No such limitation is placed upon respondent corporation here. The articles of incorporation in that case are much narrower in grant of powers in essential respects than are those of the instant case. It is neither significant nor strange that in the instant case no provision was made by the articles of incorporation for the acquirement of property or other rights by the method of condemnation as authorized by our present law of eminent domain. These terms, now common, were unknown to the earlier statutory law period within which respondent was incorporated. The only method of acquiring property for sup-

plying cities or towns with pure fresh water, except by purchase, gift, or conveyance, was by following the statute adopted for the benefit of railroad corporations, which method consisted of presenting a petition to the judge of the district court, who appointed five commissioners of appraisement, who, upon giving such notices as were prescribed by law, became vested with the power of ascertaining in a procedural method the value of the property sought to be acquired and the assessment of whatever damages that may have otherwise accrued. The statute which gave the right to acquire property provided the method of procedure, and it was not necessary or usual to specifically refer to either in the articles of incorporation. [2] While it is true that purposes avowed in articles of incorporation do not fix the character of the corporation in its future activities as being a public service corporation, as stated in *Allen* v. *Railroad Commission, supra,* and that the additional act of dedication is necessary to the creation of a public use, it is also true that when the original appropriators of water from a stream, having declared by broad terms that its purposes are to secure the commodity for a consumption or use which cannot be otherwise than to supply a general public use, organize a corporation which in its articles of incorporation declare its purposes to be that of utilizing the water thus acquired for sale, for manufacturing, mining, mechanical, chemical, agricultural, and for general domestic purposes to be conducted by means of canals, flumes, aqueducts, reservoirs, pipes, and other necessary conduits to a vast area of gold-bearing regions, agricultural lands, and to inhabited districts and communities widely separated from each other and to all other places lying adjacent to the route of its main system and its lateral branches, and when such corporation proceeds under such declared purposes and does establish a distributing system and actually furnishes water for mining, irrigation, and domestic purposes in large quantities through a period of many years to thousands of consumers indiscriminately and without refusal to anyone who made application or request for the use of its water for any purposes whatsoever at rates adjusted to the uses to be made of the water, and has apparently held itself in readiness to comply with its declaration of purposes as rapidly as the growth of the communities to which it extends would permit or has

required, it must be held that substantial evidence of such a carrying into effect of the originally declared purposes of the original appropriators of such water and of the corporation formed by them has been presented as would suffice, in the absence of countervailing facts, to justify a finding that the water thus acquired and utilized by such corporation had from its inception been dedicated to a public use and that such corporation was a public utility. (*Brewer* v. *Railroad Commission*, 190 Cal. 60 [210 Pac. 511].)

[3]   And, if it be a fact, as was found by the Commission, that respondent at its inception or at any subsequent time dedicated its waters to a public use, there being no claim that such dedication has at any time since been revoked, said waters have since continued to retain the impress of a public use. (*Allen* v. *Railroad Commission, supra; Brewer* v. *Railroad Commission, supra; Franscioni* v. *Soledad L. & W. Co.*, 170 Cal. 221, 228 [149 Pac. 161]; *Leavitt* v. *Lassen Irr. Co.*, 157 Cal. 82, 89 [29 L. R. A. (N. S.) 213, 106 Pac. 404].)

[4]   The contracts which have been superseded, so far as the water charges are concerned and which form the basis of petitioners' complaint, differ widely from the contracts considered in *Allen* v. *Railroad Commission, supra,* the case relied upon by petitioners, and which concededly is the most favorable to their claim of any to be found in our reports. The contracts before us, reduced to an epitome, are substantially as follows: The petitioners, in consideration of the sum of one dollar paid to each of them by the Natomas Water Company, respondent's predecessor, by separate but substantially identical contracts, conveyed to said water company the right to enter upon the lands of each of said petitioners situate in Sacramento County for the purpose of constructing and maintaining upon said lands a canal of a capacity sufficient to convey not less than 1,000 and not more than 2,000 inches of water, measured under a four-inch pressure, the course of which canal had been located before the making of said contracts. The privilege of entering upon said lands to construct said canal also carried with it the right to enter at all needful times to maintain it. It was agreed that the canal should be constructed by the fifteenth day of May, 1893, and petitioners were thereafter to be perpetually furnished with such quantities of water as they should require

for the irrigation of their lands, or such part thereof as they might desire to irrigate, at a price not to exceed five dollars per calendar year per acre for bearing orchards and vineyards and land irrigated for other purposes, and not exceeding three dollars per calendar year per acre for orchards and vineyards not in bearing. Petitioners were not bound to use any water from said canal if they did not desire to do so. It was further provided that should the water company fail to keep the covenants and agreements on its part to be kept the petitioners should have the right to terminate the rights and privileges granted by them.

It will be necessary only to point out a few of the characterizing features which distinguish the contracts considered in the case of *Allen* v. *Railroad Commission, supra,* from the contracts before us. There, Whittier, the applicant, and his associates, were the owners of a large body of land which was of small value in its arid state, but which the owners believed could be made very valuable if artificially supplied with water. They formed two corporations, to wit, Hemet Land Company and Hemet Land and Water Company. Whenever a parcel of land was sold by the Hemet Land Company the purchaser of such land desiring water thereon was obliged to purchase a water-right certificate from the Hemet Land and Water Company. The land company sold the land and the water company sold so-called "water certificates." These certificates entitled the holder to one miner's inch of water for eight acres of land. Purchasers paid seventy-five dollars an acre for their land and seventy-five dollars per acre for their water rights appurtenant to their land. The water right was inseparable and was only transferable with the land. The water-right certificates contained a binding obligation upon the water company to deliver to the purchaser a constant flow of one inch of water for each eight acres of land. The purchaser paid in addition to seventy-five dollars an acre for the water right the sum of two dollars an acre while the contract remained in force. The use of water was limited to described land. The contract bound all assignees or successors in interest, but could not be assigned without the written consent of the company. The quantity of water which appellant could supply was limited. Approximately ninety-four per cent of appellant's waters were devoted to use under its water-right certificates,

three per cent in supplying the needs of the municipality and citizens of the town of Hemet, leaving three per cent remaining in storage. Whittier, who became the sole owner of said corporations, had for many years sought a repudiation of these contracts and water-right certificates. The opinion expressly states that he "did all that lay in his power to declare the company to be a public service corporation in order to destroy the water rights of these petitioners for which water rights he had received the sum of $438,938.50." The applicant's voluntary submission to the jurisdiction of the Commission and its declaration that it was a public utility could not, it was held, affect previously vested water rights of the petitioners. It was properly held that a dedication of one and one-half per cent or at the utmost three per cent of its waters for the use of the town of Hemet for public uses could not impose upon the ninety-seven per cent remaining the same servitude.

The facts of that case and others relied upon are so utterly different from those upon which the Commission based its order in the instant case, and to which we will later refer, as to afford no precedent for a like finding in this case. A final summary of the material facts upon which the court reached its conclusion to the effect that the applicant was not a public service corporation, none of which appear in this case, follows: "The characters of the contracts evidenced by these water-right certificates, the restriction upon transfer, the fixing of the acreage *quantum,* the enormous sum in the aggregate paid by these petitioners for their water rights, establish beyond the need of further discussion that the parties to those contracts believed that they were dealing in their private capacities and selling and receiving water for private use. But one suggestion here is sufficient. Is it conceivable that these land owners would have given Mr. Whittier and his associates a bonus of $438,938.60 for the right to use water, which right the law had given them without the expenditure of one dollar on it?" (*Allen* v. *Railroad Commission,* 179 Cal. 85 [8 A. L. R. 259, 175 Pac. 473].)

In the case at bar the water was not conducted to a definite parcel of land for private use, but, on the contrary, the system meandered and was spread over a wide area of country traversing two counties. No bonus was paid by the

petitioners for water certificates, as none existed. No contract was made as to acreage *quantum*. In fact, petitioners were privileged to use the water without limitation as to quantity at rates fixed at five and three dollars per acre per annum, or not at all, if they did not desire its use, in which case no charge was made against them. Respondent's right to conduct the water across the lands of petitioners was defeasible. Here no unconscionable advantage was sought to be taken of the contract parties as is emphasized in *Allen* v. *Railroad Commission, supra*. The only thing parted with by petitioners was a right of way for the canal through the lands of each, the advantages of which they have enjoyed for a period of thirty years. None of the lands owned by the original corporation, as far as the evidence discloses, was placed on the market until 1880— twenty-seven years after its incorporation. At that time a thousand acres were offered for sale, but no offer was made to convey the land with a proportionate share of water appurtenant thereto, the only reference made to water at all was in respect to furnishing purchasers with water for irrigation at very low rates. The offer of sale stated that canals and irrigation ditches had been constructed through the property, thus "insuring a large crop and water will be furnished at reasonable rates for the purposes of irrigation." It cannot be said in this case, as was said in the other, that the intention of the original plan was to "apply the waters to the land which the managers of the enterprise had for sale and to *none other*, except to the extent of any incidental surplus."

A brief reference only will be made to the evidence which necessarily is meager on account of passing years. But few persons are likely to be now alive who were then at an age when the mind would have become impressed by the matters before us and much record evidence has been lost or destroyed.

It is a part of the history of California, of which we take judicial notice, that in the early days of placer and hydraulic mining water-power was much prized, as it was indispensable to the operation of such a system of mining. Water was brought from great distances at a great expense to the lower reaches of gold-bearing soils and sold to miners at a profit to its purveyors. The original corporation was organized

193 Cal.—3

before the purchase of any land whatsoever. In fact, water had been conveyed to the general locality as early as 1852. It is reasonable to conclude, not alone from the declared purposes of the original corporation, but from the situation itself, that the purposes of the incorporators was to sell water to miners and all others who should apply for it. The sale of water seems to have been its chief purpose. Indeed, the evidence shows that the corporation as early as 1876 was offering its lands free from ground rent to all persons who would go upon them for the purpose of mining, charging a water rate in case the applicants should be successful in finding gold. As many as 500 persons at one time were thus occupying lands belonging to said corporation. It is the undisputed evidence that 6,000 acres were prospected and mined under this sort of a water rental. Water was also furnished for the irrigation of several hundred acres of vineyard and orchard lands. The town of Folsom and other communities were supplied with water. David W. Finch, who had been the assistant superintendent of the Natomas Water and Mining Company beginning with 1876 and continuing for thirty-two years thereafter, when asked concerning mining operations upon the land, replied that people were mining "all over" the property. No charge was made for the use of land during his time. The charge made generally for "drift" mining was "so much a dump. If it was a 2,000 dump we charged him $75, usually, and for a 3,000 we charged him, proportionately, that is, that was first water; sometimes with second water it was cheaper." The water was also used for "bank" mining along the different creeks, particularly Willow Creek and Alder Creek. For this use water was generally sold by the inch. This system continued until 1906. The company had two bank claims which were worked by it at broken periods. When working its main claim it used 2,100 inches of water during five days of the week, according to the estimate made by witness Finch, assistant superintendent. The water sales from 1876 to 1886 amounted to $22,000 a year. The record of the water sales for the year 1892 totals $14,616.45; for 1893, $11,469.04; for 1894, $12,896.61. The decline of mining operations accounts for the falling away of water revenue. The evidence in the record shows that the town of Folsom was supplied by the vineyard company with water

in the year 1893. Said company also supplied the railroad company with water. While the witnesses were unable to state definitely the amounts of water furnished for the several uses they knew the general purposes for which it was supplied. The first pipe system was laid into the town of Folsom in 1889 and from that date forward water was sold for domestic purposes. Prior to the installation of the pipe system water was conducted in open ditches into said town. One ditch was constructed to the state prison and some forty or fifty pipe-lines lead from the ditch into Chinese quarters. Neither the quantity nor the use of water was anywise limited as to individuals or purposes. Upon the decline of mining operations, in about 1876, the original company began clearing its lands and set out vineyards to the extent of 1,000 or 1,300 acres. It also at one time conducted a nursery. Such amounts of water were used as were necessary for the irrigation of both, but during all times there was furnished to a large number of the public, diffusely located and representing various industries, water sufficient for the uses of all. The system was very extensive and consisted of a main canal and a number of laterals. We think it unnecessary to go further into the evidence in order to demonstrate the jurisdictional power of the Commission to make the order attacked.

[5] Objection has been made to the reception of certain evidence before the Commission which, it is claimed, was not legally admissible. Reception of testimony not strictly within the rules of evidence is not of itself a ground for the annulment of an order or decision of the Commission. As was said in *Brewer* v. *Railroad Commission, supra,* "this is not an ordinary appeal, nor has this court the authority, under its limited powers of review, to set aside orders of the Railroad Commission in matters over which it has been given jurisdiction, because of errors in the admission or rejection of evidence." If there is sufficient legal evidence to be found in the record to sustain the Commission's order the requirements of the statute are satisfied. In such a case incompetent or immaterial matter becomes mere surplusage. Grouped under the heading of evidence improperly admitted are excerpts from findings appearing in the reports of this court and in the United States supreme court upon review of certain decisions on appeal from state

courts in which the Natomas Water and Mining Company is defendant. These decisions review the history of the construction and the purposes of the construction of the water system before us in this proceeding and tend strongly to support respondent's claim that it has been from its beginning a public utility. It is admitted that the findings in these cases are *res inter alios acta* but, it is claimed, they are admissible under a well-recognized exception to the hearsay rule upon the principle that oral declarations and hearsay evidence are admissible to establish matters of general and public interest and as a means, and in many cases the only means, of proving traditionary reputation and ancient documents. Respondent's claim is not wholly without merit, · but we feel satisfied that even though the matters complained of, and which were admitted in evidence, be eliminated from the record by us, we would not even then be justified in disturbing the Commission's findings.

What has just been said is also applicable to the objection made to the reception of the report made in 1892 from a compilation of various reports of former superintendents of respondent's predecessors, many of whom, if not all, are now deceased, and which show the revenue derived from water charges at a very early period of the system's existence.

A refusal in very recent years by the Natomas Water Company of an application made by an irrigationist to transfer the use of water from a certain acreage to another of equal area or to supply additional water to others is made a ground of complaint. But such refusal was probably justified or deemed insufficient to overbalance the substantial facts which form the basis of the order.

[6] Petitioners have prepared a table showing the proportions of water furnished to the town of Folsom and devoted to other purposes covering a period of seven years preceding the year 1921 by which it is suggested that the larger proportion of the water furnished by respondent for all purposes was consumed or used by itself. This table purports to cover only a very recent period and but a brief portion of the water system's existence, and giving it its fullest significance for the period covered it could not control the entire situation, nor is it proof that the corporation was

not prior thereto impressed with the character of a public utility.

[7]   The point is made by petitioners that if the Natomas Water and Mining Company was a public utility it had no right, without legislative sanction, to transfer its properties to the Natomas Vineyard Company. The real question here is not whether the transfers made by one corporation to the other are in any sense defective or wanting in legal requirements, but rather it has to do with the status of the corporation. The title by which it holds its property is not necessary to a decision of the sole issue before us.

[8]   We have also considered the omission on the part of the boards of supervisors of the counties in which the public utility maintained its system to regulate the same as provided by article XIV, section 1, of the state constitution. This duty was not always performed by the boards of supervisors of the several counties and the omission of such a duty by a public body at best is only a circumstance which was doubtless considered by the Commission.

Upon review of the whole case we are satisfied that we would not be justified under the limitations placed upon us by the state constitution and the Public Utilities Act in disturbing the Commission's order.

The order is affirmed.

Lawlor, J., Lennon, J., Waste, J., Myers, J., Kerrigan, J., and Wilbur, C. J., concurred.