[L. A. No. 3886.    In Bank.—January 23, 1917.]

## LIMONEIRA COMPANY et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

PUBLIC UTILITY—MUTUAL WATER COMPANY OBTAINING SUPPLY FROM PUBLIC UTILITY.—A mutual water company, receiving water from a public utility under a contract for a term of years at a fixed, discriminatory rate, which it supplies to its stockholders to be used on their lands, is a customer of the utility with the rights and subject to the obligations of its other customers. It occupies the same position precisely as does a single individual taking water from the utility for the irrigation of his lands, and the fact that it represents a combination of several persons is immaterial in rate fixing proceedings.

ID.—CONTRACT TO FURNISH WATER BY PUBLIC UTILITY—REGULATION OF RATES BY RAILROAD COMMISSION.—A contract, made subsequent to the adoption of the constitution of 1879, whereby a public utility undertook to furnish water for a certain period to a mutual water company, is subject to the power of the state, vested in the railroad commission, to modify and practically to annul it in so far as the prescribed rate is concerned in the regulation of the public use.

ID.—OBLIGATION OF CONTRACT NOT IMPAIRED.—The exercise by the state of the power to thus affect such an existing contract does not impair the obligation of a contract within the meaning of the federal constitution, if the state has not surrendered to the public utility involved, by something tantamount to a contract between it and the public utility, any portion of its regulatory power.

ID.—SALE OF PROPERTY OF PUBLIC UTILITY—RESERVATION OF PRIVATE RIGHT.—Upon the sale of the water system of a public utility which was devoted wholly to public use, the grantor cannot, under the guise of a reservation, create a private right of ownership as to a part of the property devoted to public use, for its benefit or that of its sole stockholder.

ID.—JURISDICTION OF RAILROAD COMMISSION—DETERMINATION OF FACTS. The railroad commission has the power to determine for the purpose of the exercise of its jurisdiction to regulate a public utility by the fixing of rates, subject to such power of review as is possessed by the supreme court, all questions of fact essential to the proper exercise of that jurisdiction. Its jurisdiction cannot be affected by the circumstance that these facts are denied.

APPLICATION for a Writ of Certiorari to annul an order of the Railroad Commission of the State of California fixing rates to be charged by a public utility.

The facts are stated in the opinion of the court.

George E. Farrand, Andrews, Toland & Andrews, Lewis W. Andrews, Thomas O. Toland, and A. V. Andrews, for Petitioners.

Douglas Brookman, for Respondents.

Edward M. Selby, for Santa Clara Water and Irrigating Co.

ANGELLOTTI, C. J.—This is a proceeding in *certiorari* looking to the annulment, in so far as it affects petitioners, of an order fixing the rates to be charged by the Santa Clara Water and Irrigating Company, hereinafter referred to as the Santa Clara company, admittedly a public utility subject to the jurisdiction of the railroad commission.

The Santa Clara company having passed a resolution raising the rate to be charged by it to twenty-five cents per miner's inch, except as to water under contract at a lower rate, applied to the railroad commission for an order declaring the proposed rate reasonable and making it effective. The proposed rate in no way affected either Limoneira Company, a corporation, which was receiving through the ditches of the Santa Clara company two hundred inches of water, claiming by virtue of certain contracts and under the right to have the same delivered by the petitioner company, free of charge, or the Thermal Belt Water Company, hereinafter styled the Thermal Belt company, which was receiving two hundred inches under a lease for the consideration of eight hundred dollars per annum. These companies were made parties to the proceeding before the railroad commission, together with the Farmers' Ditch Irrigating Company, hereinafter styled the Farmers' Ditch company, the alleged owner of the two hundred inches that were being delivered to Limoneira Company, the Limoneira Company being the sole stockholder of said Farmers' Ditch company. The order of the commission fixed a rate of twenty cents per miner's day inch for all consumers except the Limoneira and Thermal Belt companies, and fixed as the rate to be paid by each of them annually the sum of two thousand dollars. It is the portion of the order purporting to affect these companies that is complained of. We do not understand that any question is raised as to the

reasonableness of the rate so fixed, in the event that the commission had the power to fix any rate at all so far as these companies are concerned. The claim is that under the circumstances shown by evidence free from conflict, the commission was without power to prescribe any rate at all as to the Limoneira Company, or any other rate than eight hundred dollars per annum as to the Thermal Belt company.

At first glance the facts appear to be very complicated, but consideration thereof makes it possible to state what we believe to be the material facts in such a manner as to clearly show in comparatively few words the real questions involved.

The Santa Clara company owns and controls two separate and distinct systems for selling and distributing water for irrigation purposes, one on the southerly side of the Santa Clara River in Ventura County, which it owned and operated for many years prior to 1905, and the other on the northerly side of said river, which it acquired in 1905 from Leopoldo Schiappa Pietra, who had acquired it in 1904, apparently for the company. The Limoneira Company and the Thermal Belt company are served by the northerly system, and we are not concerned here with any question as to the water served by means of the southerly system.

The system on the north side of the river was known as the Farmers' ditch. It was inaugurated somewhere about the year 1871 by a few settlers for the irrigation of their lands, the water being diverted on the north side of the river and conveyed through ditches. The record furnishes practically no information as to terms and conditions upon which water was furnished prior to the year 1896, but there is nothing to indicate that the use was not the same prior to that year that it was in 1896 and subsequently. The record is apparently destitute of information as to the owners prior to the year 1896, or the quantity of water claimed or actually diverted from the river to the ditch prior to that year. We have merely the fact that about the year 1871 the ditch was at least partially constructed for the purposes of some seventeen settlers on the northerly side of the river, and that some water was furnished for irrigation by means of the same. In 1896 we find that the system was owned by one Lisle, who then leased it to E. Nichols and C. A. Belyea, who operated it purely as a public utility for two or three years, furnishing water for a compensation to those under the ditch who desired it. They

were then diverting and delivering between four hundred and
five hundred inches. In 1898 Lisle caused the Keystone
Mining, Manufacturing, Land & Power Company to be in-
corporated, and it became the owner of the system, Nichols
continuing in charge for the corporation, which operated the
property in the same way as Nichols and Belyea had done
under their lease, i. e., as a means of selling and distributing
water for a compensation. This company in 1898 entered
into the first contract with the Thermal Belt company for two
hundred inches of water, the same to be delivered through the
ditches of the system at the pumping plant of the Thermal
Belt company to be erected on the ditch, for an annual rental
or sum. The instrument purported to be a lease for a term
of years of such water and the right to have the same diverted
from the river and carried through the ditches to such point.
The Thermal Belt company was and is a mutual water com-
pany, supplying water to lands above the. ditch. In the in-
strument the Keystone company covenanted that it was the
owner and had the right to divert from the river, and was
distributing at least one thousand five hundred inches of
water, and that it was a portion of such waters that it was
contracting to deliver. The Farmers' Ditch company was
then organized as a corporation, and the Keystone company
conveyed to it all of its property. It was provided in the
articles of incorporation that one of the purposes was "to
divert, take, convey, have, buy, sell, use, distribute, supply
. . . water for any and all beneficial uses, and erect, con-
struct, and maintain water works of every kind and nature
and water pumping plants." This company (Farmers'
ditch) in 1901 entered into an agreement with one Clarise H.
Ramsey by which it purported to demise and let to her a con-
tinuous flow of two hundred miner's inches during the irri-
gating season, for ten years, at two hundred dollars per year,
the same to be delivered at any point on the ditch designated
by her where she chose to locate her pumping plant. In 1903
the Farmers' Ditch company entered into the contract with
the Thermal Belt company under which the latter bases its
claim herein. It was practically a renewal of its former con-
tract with the Keystone company, except that it was for a
term expiring October 31, 1942, and the annual rental or
charge was eight hundred dollars. On September 1, 1904,
the Farmers' Ditch company conveyed all of its property to

Schiappa Pietra, the deed containing a purported reservation which is material in determining the claim of the Limoneira Company, and which will be discussed hereafter. On April 15, 1905, Schiappa Pietra conveyed the property to the Santa Clara company, which has ever since operated it. An examination of the record leaves us in no doubt as to the sufficiency of the evidence to warrant the conclusion of the commission that up to the time of the conveyance to Schiappa Pietra the various owners of the Farmers' ditch system were engaged solely as a public utility, appropriating for distribution and sale within the meaning of our constitutional provision *all* of the water diverted and carried through their ditches, and that the Thermal Belt company and Mrs. Ramsey were simply consumers from a public service water company, differing from the other consumers only in the fact that they had contracts for a term of years at specified rates. This has continued to be the situation ever since the conveyance to Schiappa Pietra and the Santa Clara company, except as to the two hundred inches of water contracted to be furnished Mrs. Ramsey and material in the matter of the Limoneira Company claim, which we shall discuss separately. There is nothing to compel a conclusion that there was any *new* appropriation of water to enable the utility to satisfy the requirements of these contracts, and certainly nothing to fairly support a conclusion that there was any private appropriation for the benefit of particular lands or particular consumers. The public utility continued to take waters to which it claimed to be entitled, for purposes of distribution and sale. Of course, the addition of its two new consumers may have made it essential for it to actually take and carry through its ditches more water than it had originally taken and carried, but in no sense did it do this as a private agency of these consumers. And, as we have seen, it was taking only water of which it then claimed to be the owner and which it had the right to divert, and distribute, and sell, and it was taking it for the purpose of distribution and sale. If the contract with the Thermal Belt company be construed as one contemplating the use of the water on the particular lands supplied by that company, or even as giving that land the right to receive water for permanent and continuous use for irrigation, it "would not technically attach it to the land as an appurtenance," and "would do nothing more than bring the land

within the territory to which the public use extended, and establish its status as land permanently entitled to share in the public use." (*Leavitt* v. *Lassen Irr. Co.*, 157 Cal. 82, 89, 91, [29 L. R. A. (N. S.) 213, 106 Pac. 404].) The same is true as to the Ramsey contract. Of course, it is entirely immaterial who were the stockholders of the Farmers' Ditch company, or even that Mrs. Ramsey was the sole stockholder, except as to shares held by others merely to qualify them as directors.

It may be added that no special reliance is apparently placed by learned counsel on the fact that the ditch was at least partly constructed and some water diverted prior to the adoption of the constitution of 1879. The record is such that it does not appear how that fact can possibly be material to any contention made by petitioner here. There is no basis in the record for any conclusion as to the amount of water actually diverted prior to 1880.

This being the situation, the question as to the Thermal Belt company is a very simple one, in view of our well-settled law. The fact that it is a mutual water company supplying the water it obtains to its stockholders to be used on their lands does not make it any the less a consumer with the rights and subject to the obligations of the other consumers. It occupies the same position precisely as does a single individual taking water from the utility for the irrigation of his lands, and the fact that it represents a combination of several persons is immaterial here. It is one of the "the public" that is being served by the public utility. The only difference between it and the other consumer was that it had a contract for a term of years at a fixed, discriminatory rate. But it cannot now be questioned that this contract, made in the year 1903, was subject to the power of the state to practically annul it in so far as the prescribed rate was concerned in the regulation of the public use. Ever since 1879 our constitution has provided that "the use of all water now appropriated, or that may hereafter be appropriated, for sale, rental, or distribution, is hereby declared to be a public use, and subject to the regulation and control of the state, in the manner to be prescribed by law"; and also that "the right to collect rates or compensation for the use of water supplied to any county, city and county, or town, or the inhabitants thereof, is a franchise, and can not be exercised except by authority of and in the

manner prescribed by law.'' The power to prescribe the rates at which water devoted to public use shall be furnished is, of course, a necessary incident of the power of regulation possessed by the state, for the purpose, among others, of preventing discrimination between persons entitled to the benefit of the use, and insuring to such persons the furnishing of the water to which they may be entitled upon fair and reasonable terms. It is a continuing power that may be exercised at any time, regardless of any attempted contract existing between the public utility and a consumer. We are speaking, of course, with reference to appropriation of water and contracts made since 1879, for the exigencies of this case require no consideration of alleged rights of an earlier date. Any such contract, although not in violation of any existing law or regulation when made, was necessarily made subject to this continuing power of the state to so affect it, just as much so as if the contract had contained a provision expressly making it so subject. No preferential right as to rates to be paid for the use of any part of the water devoted to public use can be so created by contract between the parties as to be immune from such regulation by the state. The effect of the provisions of our own constitution in this regard is so exhaustively and clearly stated in *Leavitt* v. *Lassen Irr. Co.,* 157 Cal. 82, [29 L. R. A. (N. S.) 213, 106 Pac. 404], where our earlier decisions are reviewed, as to render further citation or discussion unnecessary. (See, also, *Pinney & Boyle Co.* v. *Los Angeles Gas etc. Co.,* 168 Cal. 12, 18, [Ann. Cas. 1915D, 471, L. R. A. 1915C, 282, 141 Pac. 620] ; *Southern Pacific Co.* v. *Spring Valley Water Co.,* 173 Cal. 291, [159 Pac. 865].) The uniform course of decision of the United States supreme court on questions similar in principle precludes any claim that the exercise by the state of the power to thus affect such an existing contract as that here involved impairs the obligation of a contract within the meaning of the federal constitution. We are speaking, of course, of a situation where the state cannot be held as matter of fact to have surrendered to the public utility involved, by something tantamount to a contract between it and the public utility, any portion of this regulatory power, which is the situation here. The railroad commission has been vested by the state with this power of regulation, and the contract of the Thermal Belt company cannot be held

to prevent the exercise of that power in so far as the fixing of the rate to be paid by it is concerned.

The Limoneira Company claim to be served with the two hundred inches free of charge is, to our minds, equally untenable, though it depends on facts of a somewhat different nature. The Limoneira Company is the successor of Mrs. Ramsey, the owner of the lands formerly owned by her and supplied with water under her contract of lease, and also the sole stockholder of the Farmers' Ditch Company. It is claimed that the ownership of the right to this water never passed to Schiappa Pietra, or his grantee, the Santa Clara company, but remained in the Farmers' Ditch company, and that all that the Santa Clara company acquired in connection therewith was its obligation to divert and convey its water through its ditches to the pumping plant and there deliver it to be carried to the lands to be supplied. This claim is based on the attempted reservation in the deed to Schiappa Pietra, to which we have already referred, and the covenants of the grantee in connection therewith. Save and except for this attempted reservation, the deed of the Farmers' Ditch company was an absolute conveyance of all its water and water rights and claims thereto, in and to the waters of Santa Clara River and Santa Paula Creek, their branches, sloughs, and tributaries, its right to divert water therefrom, its right to use, own, sell, rent, distribute, etc., said water and water rights, its works, ditches, etc., and all other property owned by it; in other words, a grant of its whole system and all property and rights owned by it in connection therewith, "excepting and reserving," only "subject to the terms, covenants, and conditions herein contained, unto the party of the first part, its successors and assigns forever, out of and from the water and water rights and other property above described such a quantity of water of the waters of the Santa Clara River that when the same shall be diverted by means of the dams and head works herein mentioned and shall be conducted from said Santa Clara River by means of the water ditch, ditches, conduits, and flumes herein mentioned to the pumping station situated in the northwest corner of subdivision 18 of the Rancho Santa Paula y Saticoy, and hereinafter more particularly described, it shall produce or measure 200 inches of water at said pumping station, and the right to divert said amount of water hereby excepted and reserved

from said Santa Clara River; also excepting and reserving a right of way and easement in, along, and through the water ditch and dams, head works, conduits, ditches, and flumes and over and along the rights of way above described, to divert said quantity of excepted and reserved water from said Santa Clara River and to convey and conduct the same or any part thereof from said point of diversion to said pumping station, together with a right of way and easement in said ditches, flumes, and conduits herein mentioned for conveying whenever necessary the waste or surplus of and the waste or surplus incident to the handling of the water hereby excepted and reserved, from said pumping station to the place where the main ditch or conduit of the water system above described crosses or shall cross the place usually called the 'Wheeler Canyon' or 'Todd Baranca';

"The party of the first part does for itself, its successors and assigns, forever hereby covenant and agree to and with the party of the second part, his heirs and assigns forever, that the 200 inches of water herein excepted and reserved by and to the party of the first part and to its successors and assigns shall and may be used and sold, leased or rented for irrigation, domestic and stock purposes and for other lawful uses and purposes by the party of the first part, its successors and assigns, for use upon, but not elsewhere than upon the following lands."

Then follows a description of what are known as the Olive lands and certain portions of the Limoneira Ranch. Then follow covenants to the effect that the grantee, Schiappa Pietra, shall maintain the system and deliver the water, and if such is not done the party of the first part, the grantor, may do so at the expense of the grantee.

It is further agreed that the existence of the contract between the Farmers' Ditch Irrigating Company and the Thermal Belt Water Company, of the first day of September, 1903, be recognized and that all rentals, rights, and advantages secured to the party of the first part are granted, sold, and assigned and transferred to the party of the second part. The party of the second part undertakes to perform the obligations of the party of the first part to the Thermal Belt Water Company. It is further agreed that the lease of the Farmers' Ditch Irrigating Company with Clarise H. Ramsey of December 9, 1901, expiring on the ninth day of Decem-

ber, 1911, shall continue to be held, and the burdens and responsibilities thereof shall continue to be assumed and borne by the party of the first part. And the party of the first part covenants to save harmless Schiappa Pietra, the party of the second part, from any and all of the conditions and provisions contained in said lease. Apparently the consideration given by Schiappa Pietra for the transfer was thirty-three thousand dollars, the obligations assumed by him being the continued delivery of the water and the payment of the thirty-three thousand dollars, and in return he received the rent of eight hundred dollars per year from the water sold to the Thermal Belt Water Company and all the other water of the system.

On the fifteenth day of April, 1905, Schiappa Pietra conveyed all of the property theretofore acquired from the Farmers' Ditch Irrigating Company to the Santa Clara Water and Irrigating Company for the sum of $33,995. The same reservation was made in this conveyance from Schiappa Pietra to the applicant herein as was made in the conveyance to Schiappa Pietra.

Upon this, Limoneira Company, now the sole stockholder of the Farmers' Ditch company, claims to be entitled to the delivery of this water without charge. In view of the facts of the case, as we have heretofore stated them, the case of *Leavitt* v. *Lassen Irr. Co.,* 157 Cal. 82, [29 L. R. A. (N. S.) 213, 106 Pac. 404], appears to be conclusive against the claim. The property and rights attempted to be reserved were simply a part of property devoted *wholly* to public use, an inseparable part of the system owned by the grantor, the Farmers' Ditch company, exclusively devoted to that use. Certainly the instrument of conveyance was drawn with great care and ability in an effort to carve a private right of ownership out of this public use as to a part of the property devoted to public use, for the benefit of the Farmers' Ditch company and its then sole stockholder, Mrs. Ramsey. The difficulty is that such a thing could not be accomplished under our law by the parties to this transaction. This case can not be distinguished on the facts from *Leavitt* v. *Lassen Irr. Co.,* 157 Cal. 82, [29 L. R. A. (N. S.) 213, 106 Pac. 404]. There Leavitt granting his water system attempted to make a reservation of the right to take water for the irrigation of

CLXXIV Cal.—16

his ranch. Mr. Justice Henshaw said in an opinion concurred in by all the members of the court except Chief Justice Beatty: "Treating Leavitt's appropriation as being wholly and entirely for public use he, the owner of the system, was but an instrumentality for the distribution of the waters which he gathered to such members of the public as might apply for them and pay to him the legal charge for the service that he rendered. As the agent of such a public use he had no power whatever to reserve to himself for his private purposes any part of this water. If he could reserve a part, he could reserve all, and thus, by his *ipse dixit*, convert a public use into private ownership, or, if he could reserve a part for himself, he could with equal authority give away parts of the supply to others, and by this method destroy what the constitution itself has declared shall forever remain a public use." And again: "If . . . the facts should be that he did not make such private appropriation, his attempted reservation of a private right out of a public trust, as above stated, would be futile and void." In the case at bar it is clear that the attempted reservation was solely for the purpose of creating a private right for the lands of Mrs. Ramsey, which it is claimed has now been fully accomplished. The railroad commission had full support in the record for its conclusion that the attempted reservation was futile and void, and that the whole property passed to the grantee.

A large part of the briefs of learned counsel for petitioner is devoted to discussion of a claim that the railroad commission was without jurisdiction to determine any question as to the validity of petitioner's asserted rights of property in regard to the waters claimed by them in good faith. In view of the provisions of our constitution and the Public Utilities Act, and our decisions thereunder, we do not see how it can be doubted that the railroad commission had the power to determine *for the purposes of the exercise of its jurisdiction to regulate a public utility by the fixing of rates,* subject to such power of review as is possessed by this court, all questions of fact essential to the proper exercise of that jurisdiction. And, of course, as said in *Palermo Land & Water Co. v. Railroad Commission,* 173 Cal. 380, [160 Pac. 228], "wherever a court or board is authorized to act upon the existence of a certain state of facts, it has jurisdiction to determine the existence or nonexistence of the requisite

facts," and "its jurisdiction cannot be affected by the circumstance that these facts are denied." The opinion in the case just cited sufficiently answers the claims of petitioner in this regard.

We find in the briefs no other objection meriting discussion.

The order of the railroad commission is affirmed.

Henshaw, J., Shaw, J., Melvin, J., Lorigan, J., Sloss, J., and Lawlor, J., concurred.

Rehearing denied.