[L. A. No. 8207.    In Bank.—April 16, 1925.]

## THE SAMUEL EDWARDS ASSOCIATES (a Corporation) et al., Petitioners, v. THE RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

[1] Public Utilities—Water and Water Rights—Public Service.— Where land owners in a certain district appropriated and diverted waters of a certain creek for the irrigation of their lands and constructed ditches and a water system for such purposes, and thereafter organized a corporation and transferred their interests in the water ditch in return for the stock of the corporation, the articles of incorporation declaring, among other things, that the purpose of the company was to sell, use, and dispose of water for the purpose of irrigation, etc., and the record shows that there was never any relation between the shares of stock of the company owned by land owners and the acreage irrigated, but from the inception of the enterprise there was a "holding out" to sell water to any applicant within the area adjacent to the system and within the limits of supply and that the company has actually sold water to everyone that applied, the facts justify finding that the water acquired and utilized by the corporation was from its inception dedicated to a public use, and that such corporation was a public utility.

[2] Id.—Public Use—Dedication by Implication.—Property may be shown to have been devoted to a public use by implication from the acts of its owners and their dealings and relations to such property, without regard to statutory provisions.

[3] Id.—Nature of Company—Test.—In determining whether a water company is a public utility or a mutual company not subject to regulation by the Railroad Commission, the test is whether those offering the service have expressly or impliedly held themselves out

---

1. See 22 Cal. Jur. 12.

2. What constitutes dedication to public use, note, 27 **Am. Dec.** 559. See, also, 22 **Cal. Jur.** 13.

as engaging in the business of supplying water to the public as a class, not necessarily to all of the public, but to any limited portion of it, such portion, for example, as could be served from their system, as contradistinguished from holding themselves out as serving or ready to serve only particular individuals, either as a matter of accommodation or for other reasons peculiar and particular to them.

[4] Id.—Railroad Commission—Jurisdiction—Findings—Evidence.— If there was any evidence before the Railroad Commission that would justify its finding that a water company was not a mutual company, but that the owners of the system were operating a public utility water company and were subject to regulation by it, its order cannot be annulled.

[5] Id.—Dedication—Continuance of Public Use.—If a water company at its inception, or any subsequent time, dedicated its water to a public use, and such dedication has not since been revoked, said waters have since continued to retain the impress of a public use.

[6] Id.—Revocation of Dedication—Consent of Beneficiaries.— Where a water company has dedicated its waters to a public use, it cannot revoke such dedication, and convert the waters into a private use, without the consent of all the beneficiaries of such use.

[7] Id.—Sale to Public—Right to Insist on Continuance.—Where the evidence before the Railroad Commission establishes the fact that a water company at times consciously offered and held itself out to sell water to all those within the area of its service, the consumers to whom it has heretofore sold water have a right to insist upon the continuance of the supply to their lands; and the company being a public utility it is within the jurisdiction of the Railroad Commission in the matter of the fixing of rates.

[8] Id.—Railroad Commission—Jurisdiction—Findings—Certiorari. Where evidence in proof of facts is substantial in character and justifies the inference or conclusion that the facts necessary to the jurisdiction of the Railroad Commission did exist, under the general principles of law regarding proceedings in *certiorari,* its decision as to the effect of such evidence is binding and conclusive on the reviewing court.

---

(1) 40 **Cyc.,** p. 825, n. 61.   (2) 18 **C. J.,** p. 58, n. 4.   (3) 40 **Cyc.,** p. 829, n. 7.   (4) 40 **Cyc.,** p. 829, n. 7.   (5) 40 **Cyc.,** p. 829, n. 7. (6) 40 **Cyc.,** p. 831, n. 15.   (7) 40 **Cyc.,** p. 831, n. 15, p. 832, n. 26 New, p. 836, n. 55.   (8) 40 **Cyc.,** p. 836, n. 55.

4.  See 22 **Cal. Jur.** 15, 25.
7.  See 22 **Cal. Jur.** 16, 50, 54.

APPLICATION for a Writ of Certiorari to annul an order of the Railroad Commission determining that the owners of a water system were operating a public utility water company and were subject to regulation by it. Orders of Commission affirmed.

The facts are stated in the opinion of the court.

Farrand & Slosson and Hugh Ward Lutz for Petitioners.

Carl I. Wheat and Woodward M. Taylor for Respondent Railroad Commission.

R. M. Clarke, Clarke & Bowker and Floyd S. Warring for Respondent Piru Water Company.

WASTE, J.—In this proceeding, petitioners, who are consumers of irrigation water in Ventura County, seek annulment of certain orders of the respondent Railroad Commission declaring that Piru Water Company, a defunct corporation, and the individual respondents are conducting and operating a public utility, and fixing the rates to be charged for water supplied to consumers for irrigation purposes.

From the return of the Railroad Commission, filed in response to the writ issued herein, it appears that on May 24, 1923, the Piru Water Company and the individual respondents herein filed with the Railroad Commission a petition representing that the water company was engaged in the business of supplying, delivering, and selling water in the county of Ventura, and owned and operated a system for supplying and selling water, known as the Piru Water Company System. It was further alleged that the rate of eight dollars per acre per year for water, charged to its consumers, did not afford the company or its stockholders a reasonable return on its property; wherefore it prayed for an order authorizing the applicants to make such increase in rates for water delivered through the system as would afford a reasonable return on the investment. A public hearing was had, at which, in opposition to the application, it was contended by the protestants that the Piru Water Company, by reason of having forfeited its charter through failure to pay

corporation taxes, had had no corporate existence for a period of eighteen years, and that during all of that period it had been carried on in all respects as a mutual company, and was not subject to regulation by the Railroad Commission. The Commission declined to enter into a discussion as to the legal status of the utility as a corporation, or to fix the ownership other than to find that it was not a mutual company, but that, on the contrary, the owners of the system were operating a public utility water company, as defined in the Public Utilities Act (Stats. [Ex. Sess.] 1911, p. 18), and, as such, were subject to regulation by it. It further found that the rates charged by the utility were unjust and unreasonable and that the company was entitled to an increase, which it authorized in an order made on the third day of October, 1923.

Certain of the protestants, among them these petitioners, filed an application for a rehearing before the Commission, which was granted. After another public hearing, the matter was resubmitted, and the Commission entered a new order in which it found that no new evidence had been introduced which justified it in modifying or changing its order theretofore made. Consequently, on the fifth day of June, 1924, it made its order affirming its decision of October 3, 1923. These orders and the proceedings leading thereto, the petitioners seek to have reviewed.

As the basis of its conclusion, the Commission found the following facts:

"The evidence indicates that the pioneer settlers in Ventura County located west of Piru Creek, in the area locally known as the 'Piru and Buckhorn District,' appropriated and diverted water from Piru Creek for the irrigation of their lands. The notice of appropriation was signed by Prudencio Dominguez on January 9, 1875, and thereafter the landowners constructed ditches for irrigation use, the water system being commonly known as the 'Piru Water Ditch.' On June 29, 1887, Robert Strathearn, R. P. Strathearn, J. M. Horton, Hugh Warring and Prudencio Dominguez executed articles of incorporation of The Piru Water Company, and in return for its 2000 shares of capital stock of the par value of $10.00 per share, issued to themselves, transferred to the company their interests in the Piru Water Ditch.

196 Cal.—5

"The articles of incorporation of the company stated that the purpose for which the company was formed was 'to acquire and conduct water by means of ditches and flumes from the Piru River in and upon the lands lying between said river and the Sespe River in Ventura County, California, and to sell, use and dispose of said water for the purpose of irrigation, stock, household and general domestic use.'

"The by-laws of the company, adopted March 19, 1888, provided for the election of officers and directors, their duties; and among other things that the board of directors 'shall declare dividends whenever the surplus profits shall admit of it.'

"Shortly thereafter David C. Cook acquired from Robert Strathearn a large portion of the land which was irrigated by the ditch, and from Strathearn and others in excess of 1800 of the 2000 shares of stock of Piru Water Company. He held this stock until 1900 or 1901, when he disposed of his land holdings and stock to the Piru Oil and Land Company.

"The Piru Oil and Land Company sold parcels of the land which had been irrigated through Piru Water Company's system, sometimes transferring stock to the buyer and sometimes not. In 1922 it sold its last remaining tract of land to Hugh Warring, together with approximately 1749 shares of the stock of Piru Water Company.

"In the early stages of its history the Piru Water Company had an open earth ditch system which was improved from time to time by the construction of concrete and terra cotta pipe lines to replace sections of ditch. It has supplied water not only to stockholders but to some consumers who own no stock. The rates charged in the earlier years provided for a lower price for water to stockholders than to nonstockholders. This distinction in rates was apparently wiped out about 1910, and at the present time all consumers pay a rate of $8.00 per acre for four irrigations per annum when sufficient water is available.

"No dividends were ever paid upon the stock of the company and only one assessment, amounting to a total of $500, has been levied against the stockholders. Improvements of the property have been paid for entirely out of earnings, with the exception of a few instances where the company

has paid for the pipe and consumers have furnished the labor of installation of extensions of the system.

"In 1896 an action was commenced in the Superior Court of Ventura County, entitled *Hargrave et al.* v. *Cook et al.* In this action the Piru Water Company was a party defendant. The judgment in this action decreed that Piru Water Company was the owner of 285 inches of water, measured under a four-inch head, of Piru Creek, and that this water was appurtenant to certain parcels of land through which the company's ditch ran.

"In 1905 the Piru Water Company failed to pay the license tax required by statute and has never paid any license tax since. It was stipulated at the hearing in this proceeding that it had forfeited its charter in 1905, and that it has never been revived or restored to corporate capacity. Since that time the affairs of the concern have been carried on substantially as before, the stockholders meeting annually as was the practice during the period prior to 1905. It appears that consumers who were non-stockholders attended many of these meetings and in some cases voted with the stockholders. Rates were fixed through agreement at these meetings."

In the earlier stages of its history the Piru Water Company had a primitive system of delivery of water, and its charges to the consumers were just about enough to defray the upkeep and expense of maintenance. It supplied water not only to its stockholders, as found by the Commission, but to nonstockholders owning land adjoining the property of the original incorporators. From its records it seems quite definitely established that, during the earlier period of its existence, it charged the nonstock-owning consumers more than it charged its stockholders for the same service. Since 1910, it appears no discrimination in charges has been made. No effort seems to have been made at any time to fix rates that would enable the company to do anything more than cover its operating expenses. No dividends were ever paid. The whole system, as it was at the time application was made to the Railroad Commission for an adjustment of rates, had been built up out of funds provided by the consumers, irrespective of their holdings of stock, their contribution being in proportion to their respective use of water. The most extensive and expensive improvements to the system were made after the corporation forfeited its charter.

No previous application had been made to have the water rates fixed by the Commission. On these facts, the protestants against the increase in rates argued that the water system had never been dedicated to a public use, but that it had always been regarded by the water consumers as a mutual water company. Their contention was, therefore, that the Commission had no jurisdiction of the matter. At the same time, they were compelled to admit that the water company did not fall within the strict interpretation of section 2 of the act providing for the regulation of water companies (Stats. 1913, p. 84), defining what kind of a water company is not a public utility.

The record returned by the Commission clearly establishes that there never was any relation between the shares of stock of the company, owned by land owners, and the acreage irrigated. From the inception of the enterprise there was "a holding out" to sell water to any applicant within the area adjacent to the system and within the limits of supply. At the time of the hearing, the owners of 28.5 per cent of the irrigated land had no interest whatever in the water system. The deeds from the original owners of the water rights to the company specifically declared that the company might use the water rights, ditches, and lands granted for rights of way, to supply any who might desire to purchase water from the Piru Water Company. The recital of purposes for which the corporation was formed did not limit the sale, use, and disposition of the water to those who might hold stock in the corporation. In the early minutes of the corporation there is a notation that household water might be sold to "new customers." In 1891, in an action, *Hargrave et al.* v. *Cook et al.*, brought in the superior court of Ventura County by the lower riparian appropriators on Piru Creek to determine the respective rights of the parties to the waters of the creek, the company, in its answer, alleged that it had diverted the waters for the purpose of furnishing same to its stockholders and others for irrigation and domestic uses, and it sought to have it decreed that it be entitled to divert a designated number of inches of water for distribution to its stockholders and others, as alleged. In the judgment in that action it was declared that the ditch and right of the water company to divert water was appurtenant to the lands of the original incorporators, and that

the water company was the owner of and entitled to divert continuously, by means of its ditch, 285 inches of water for irrigation and domestic purposes upon such lands, "and when not necessary for such uses upon the said lands, to use the same upon any other lands or for any other purpose," as against the plaintiffs in the action. There is no evidence that the water company ever refused to sell water to any owner or occupier of land within its irrigable area; and there is evidence that it continually served many persons who were not stockholders. No distinction was ever made between land owners with stock and those without stock in the company, when it came to extending its system and rendering service. The Piru Oil and Land Company, which, for many years, was the largest stockholder of the water company, and a land owner under the system, sold much of its land separate from the stock, and later sold its remaining stock to other parties.

We are satisfied that, on the evidence before it, the respondent Commission was fully justified in holding that the applicants before it were conducting a public utility. The act providing for the regulation of water companies (Stats. 1913, p. 84, sec. 3) provides that "whenever any private corporation or association organized for the purpose of delivering water solely to its stockholders or members at cost does deliver water to others than its stockholders or members for compensation, such private corporation or association becomes a public utility and subject to the terms of the public utilities act and the jurisdiction, control and regulation of the railroad commission of the State of California." Clearly, the Piru Water Company, and those continuing to conduct its affairs after it forfeited its charter, come within the meaning and definition of the act. The company was not organized for the purpose of delivering water solely to its stockholders at cost. Since its organization, it has at all times been willing to and has actually sold water to everyone who applied. So far as the record indicates, it never refused to supply water to anyone when it was able to meet the demand. The fact that in the early history of the company the water may have been considered appurtenant to the land of the first users is not inconsistent with the theory of a subsequent dedication to public use. (*Traber* v. *Railroad Com.,* 183 Cal. 304, 312 [191 Pac. 366].) In that case

the court said: "The offer of the company was a general offer to any and all persons who should apply for the water upon its terms for their lands. Whether in all cases such an offer would constitute a dedication to public use or not, it is clear that evidence of such offer and acceptance is sufficient to justify a finding of such dedication." Reference was made, in the finding of the Commission, to the declared purposes of the Piru Water Company, as set out in its articles of incorporation. [1] The whole history of the enterprise, from the time the original owners of the water formed the corporation until the present, affords substantial evidence of such a carrying into effect of the originally declared purposes of the pioneer holders of the water, and of the corporation formed by them, to justify a finding that the water acquired and utilized by the corporation was, from its inception, dedicated to a public use, and that such corporation was a public utility. (*Williamson et al.* v. *Railroad Com.,* 193 Cal. 22 [222 Pac. 803]; *Brewer* v. *Railroad Com.,* 190 Cal. 60, 80 [210 Pac. 511].)

[2] Property may be shown to have been devoted to a public use by implication from the acts of its owners and their dealings and relations to such property, without regard to statutory provisions. (*Franscioni* v. *Soledad Land & Water Co.,* 170 Cal. 221, 227 [149 Pac. 161]; *Camp Rincon Resort Co.* v. *Eshleman,* 172 Cal. 561, 563 [158 Pac. 186]; *Palermo Land & Water Co.* v. *Railroad Com.,* 173 Cal. 380, 384 [160 Pac. 228].) [3] The test to be applied in a case like this is whether or not those offering the service have expressly or impliedly held themselves out as engaging in the business of supplying the water to the public as a class, "not necessarily to all of the public, but to any limited portion of it, such portion, for example, as could be served from his system, as contradistinguished from holding himself out as serving or ready to serve only particular individuals, either as a matter of accommodation or for other reasons peculiar and particular to them. (Citing cases.) [4] The rule, of course, is that if there was any evidence before the Commission that would justify its finding, its order cannot be annulled." (*Van Hoosear* v. *Railroad Com.,* 184 Cal. 553, 554 [194 Pac. 1003, 1004].)

[5] If it be a fact, as was found by the Commission, that the Piru Water Company at its inception, or at any subse-

quent time, dedicated its water to a public use, and such dedication has not since been revoked, said waters have since continued to retain the impress of a public use. (*Williamson* v. *Railroad Com., supra; Allen* v. *Railroad Com.*, 179 Cal. 68 [3 A. L. R. 249, 175 Pac. 466].) **[6]** Having dedicated its water to a public use, the company could not revoke such dedication, and convert its waters into a private use, without the consent of all the beneficiaries of such use. (*Brewer* v. *Railroad Com., supra; Franscioni* v. *Soledad L. & W. Co., supra.*) No attempt at such revocation has been shown. We are fully satisfied that the Piru Water System was not operated as a private water company within the doctrine laid down in *Thayer* v. *California Dev. Co.*, 164 Cal. 117 [128 Pac. 21], and *Allen* v. *Railroad Com., supra.* We therefore deem it unnecessary to distinguish these and other cases cited by the petitioners. **[7]** The evidence heard by the Commission satisfactorily establishes the fact that the water company at times consciously offered and held itself out to sell water to all those within the area of its service. The consumers to whom it has heretofore sold water have a right to insist upon the continuance of the supply to their lands. (*Butte County Water Users' Assn.* v. *Railroad Com.*, 185 Cal. 218, 224, 235 [196 Pac. 265].) Being a public utility, it was within the jurisdiction of the respondent Railroad Commission in the matter of the fixing of rates.

When these petitioners were before the Commission in opposition to the making of any order fixing water rates, the ground of their protest was that the Piru Water System was, in fact, a privately owned mutual water company, and, therefore, not subject to the jurisdiction of the rate-making body. (Stats. 1913, c. 80, p. 85.) They have shifted their ground and are here contending that the evidence shows that the corporation held the system and water rights to the extent necessary to supply the original land owners, under the system, as trustee for the owners of the land, to operate the system and distribute the water at substantially the cost of operation, maintenance, replacement, and improvements, and that after it ceased to exist as a corporation, by reason of the nonpayment of its license tax, those succeeding it, who are the individual respondents here, assumed the same obligation. That contention was not made in the first instance before the Commission, nor was it embodied in the

grounds advanced on petition for rehearing. Under the mandatory provision of the Public Utilities Act (sec. 66), petitioners should not urge or rely on it in this court; but we have given it careful consideration nevertheless.

Petitioners admit that no express written agreements were ever entered into by the water company, or its successors, and the land owners, which would establish the relationship they now contend for, but argue that such an agreement is to be implied. They cite *Hildreth* v. *Montecito Creek Water Co.*, 139 Cal. 22 [72 Pac. 395], in support of their position. The case is not in point. It is true the court there held, by way of *dictum*—for the decision went off on a point of pleading—that the owners of private rights to waters in a stream may join together to form a corporation to construct diversion and other necessary works, making the corporation their agent to collect and distribute water, while reserving to themselves and retaining their individual ownership in the respective water rights. There is no doubt that that may be done, but in the instant case all the private water rights of the incorporators of the Piru Water Company were specifically deeded to the company, and became its property to be devoted to the general purposes for which it was formed. In *Copeland* v. *Fairview Land etc. Co.*, 165 Cal. 148 [131 Pac. 119], also cited by the petitioners, the facts were essentially different from those involved in the case here. The owner of the tracts formed a water company and transferred to it the riparian rights of the land along the river, taking in return all the stock of the water company. It continued to sell parcels of land, together with a proportional number of shares of water stock. There were recitals in the certificates that the holders thereof should be entitled to receive a proportional share of the water "belonging to" the water company. The court said (p. 161) that the device "was a scheme for the apportionment of the water-right to the several parcels of land so that each could thereafter be conveniently sold with its proper share of the water-right," and that for such purpose the land owner "stood in the relation of trustee for the owners of the several parcels of land so conveyed." In neither of these cases was the court called upon to consider a situation arising out of facts similar to those of the case now here.

We are not convinced that the petitioners, by shifting their ground from the position they took before the Commission to that taken by them in this court, placed themselves in a more advantageous situation than they were in before the rate-making body. In the last analysis, they are met by the evidence and the well-established principles of law we have already sufficiently discussed. [8] Where evidence in proof of facts is substantial in character and justifies the inference or conclusion that the facts necessary to the jurisdiction of the Commission did exist, then, under the general principles of law regarding proceedings in *certiorari*, its decision as to the effect of such evidence is binding and conclusive on the reviewing court. (*Traber* v. *Railroad Com.*, 183 Cal. 304, 307 [191 Pac. 366].)

The orders of the Commission are affirmed.

Richards, J., Seawell, J., Shenk, J., Lawlor, J., Lennon, J., and Myers, C. J., concurred.