[S. F. No. 14560. In Bank.—October 31, 1932.]

WESTERN CANAL COMPANY (a Corporation) et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

640

Thomas J. Straub, W. H. Spaulding, Chaffee E. Hall, W. R. Dunn, Garret W. McEnerney and Andrew F. Burke for Petitioners.

Ware & Ware, Arthur T. George, Ira H. Rowell and Roderick B. Cassidy for Respondents.

D. A. Winship, District Attorney (Sutter County), Milton Hogle, District Attorney (Glenn County), Loyd E. Hewitt, A. L. Cowell, Homer J. Hankins, Charles L. Childers and Thomas C. Boone, as *Amici Curiae* on Behalf of Respondents.

THE COURT.—Petitioners ask this court to review and annul an order of respondent Railroad Commission directing them to file with it ''rates and regulations covering irrigation water service''. The term ''power company'', where hereinafter used, will designate the Great Western Power Company of California, a corporation, and its predecessors.

Petitioners contend that the finding upon which said

order is based, to the effect that they are public utility water service corporations, is entirely unsupported by the evidence, which shows conclusively that petitioner Western Canal Company is a mutual water company and that petitioner Great Western Power Company of California is a public utility electric power company, not engaged in furnishing water save as a by-product of its public electric power business, and then only in a private capacity to Western Canal Company alone under special contract. Petitioners therefore claim that the order, if enforced, will violate their constitutional rights and deprive them of their respective properties without due process of law.

Petitioners allege that in 1915 Western Canal Company was organized under the laws of this state as a mutual water company and as such has operated continuously since said time; that the proceedings here involved were not commenced until March 31, 1930, after nearly $1,000,000 had been expended in the construction of the canal system of said company and nearly $600,000 had been invested by land owners in the purchase of its capital stock of which 21,715 shares, out of an issue of 200,000 shares, appurtenant to an equal number of acres of land under irrigation, are now outstanding.

Petitioners further allege that Great Western Power Company of California was also organized under the laws of this state in 1915 and has since been continuously engaged in the generation of electric energy and sale thereof to the public; that during this period it has also sold to Western Canal Company, under special contract, as a by-product of its electric power business, and subject to prior and paramount use for generation of electric power, certain water delivered at the intake of the Western Canal Company canal on the Feather River, three miles below the city of Oroville, California; that Great Western Power Company of California is the successor in interest of the properties and assets of Great Western Power Company, the successor in turn of Western Power Company, none of which sold water save to Western Canal Company and then only as a by-product as aforesaid.

The order complained of was rendered on December 21, 1931, after an extended consideration on rehearing of two consolidated proceedings entitled respectively, "Sarah E.

Ludy *vs.* Great Western Power Company of California and Western Canal Company No. 2847,'' and ''In the Matter of the Investigation on the Commission's own motion into the operations, practices, rates, rules and regulations, services, service area, contracts, intercorporate relations, classifications, or any of them, of Great Western Power Company of California and Western Canal Company in the distribution and sale of water in the Counties of Butte, Glenn, Sutter and Colusa, State of California, Case No. 2858.'' The original decision was rendered by the Commission on December 19, 1930, after extensive hearings, and ordered the dismissal of these proceedings. The order on rehearing which is here under consideration rescinded the said order of December 19, 1930, and, as above stated, commanded petitioners to immediately file with respondent rates and regulations covering irrigation water service within the area in the Sacramento Valley served under their canal system, including service to the lands of complainant Ludy.

The substance of the findings and opinion of the Commission on rehearing will now be set forth: Complainant Ludy, the owner of about 1,000 acres of land in eastern Glenn County, desired delivery by petitioners of water for irrigation purposes. She alleged that her lands were formerly served with water by Western Canal Company, but that said company refused to deliver further water unless she purchased stock from it to the extent of one share for each acre irrigated, at a price of $20 per share. She alleged that said company was serving other lands in the vicinity as a public utility and had facilities and water supply adequate to serve her lands; further that Great Western Power Company of California, from which Western Canal Company obtained its water supply, had likewise devoted its waters to the public use and, through the medium of Western Canal Company, as its subsidiary, was operating as a public utility water company. Petitioners answered that Western Canal Company was purely a mutual concern created to supply its stockholders with water purchased under contract from Great Western Power Company, which latter company held all its waters available for irrigation for private use only, unaffected by the public interest. Upon these issues various arguments and hearings were had before the Commission.

Complainant Ludy presented her case upon three theories: 1st, that petitioners were public utilities, supplying irrigation water to large areas in Sutter, Butte and Glenn Counties, including her lands, by virtue of their succession to the canal system and water rights of the Feather River Canal Company, which had previously dedicated its property to the same public use; 2d, that Great Western Power Company of California was a public utility for supplying water for irrigation within said areas by reason of its succession to the properties of Great Western Power Company, successor to Western Power Company, both of which were water utilities by virtue of their acquisition of lands and water rights through the exercise of the power of eminent domain for domestic or irrigation uses; 3d, that petitioners themselves, since their acquisition of the properties of the old Feather River Canal Company and the beginning of service through its canal system, have so conducted their water operations as to constitute a dedication of their properties and water rights to the public use.

The Commission found that the Feather River Canal Company was organized in 1908 after an appropriation by its promoter Norris of 300 second-feet of water from the Feather River for irrigation purposes and that an adequate canal system was planned through the operation of which water would be available for sale to anyone; that, however, a stock sales and also a water rights sales campaign by Norris was unsuccessful and he was finally forced to seek a purchaser for his interest; meanwhile, he and his associates had acquired practically all the stock of the company and 5,000 so-called "water rights"; that in 1911 a sale was negotiated whereby the Brown-Walker concern became the owner of nearly all the stock of the company, together with 3,000 of Norris' "water rights" and he continued as an engineers and officer of the company. In 1912, under the new ownership, the company at once made contracts with several land owners for delivery of water in perpetuity at fixed rates. There was organized also at this time the Feather River Mutual Water Company for taking over the Feather River Canal Company, but it played an inconspicuous role and perhaps did not function at all. Thereafter and in 1915 there was completed a sale of the Feather River Canal Company properties to Great Western Power Company. The

contract of sale was executed by Feather River Canal Company and also by the Feather River Mutual Water Company. It contained no provision for the disposition of the above-mentioned outstanding· "water rights" or water delivery contracts; apparently they remained outstanding obligations of the old corporations, both of which agreed to hold the new purchasers harmless from any claims arising therefrom.

After reviewing the voluminous evidence the Commission concluded that it was the intent of the incorporators of Feather River Canal Company to serve water as a public utility within an area of at least 30,000 acres for which purpose it had an adequate water supply and that by its subsequent acts· in issuing "rights" for the purchase of water and by the execution and delivery of water contracts expressly conditioned upon the right of the state, through the Railroad Commission, to alter such contracts, said company dedicated its property and water rights to the use of all those within the area of its canal system. This public servitude, the Commission found, was not relieved by the subsequent transfer of the properties to the Feather River Mutual Water Company. Thus to the extent of the appropriation made by promoter Norris, the Commission, under complainant's first theory, disposed of petitioners' obligation to continue the service of water in the public use.

Complainant, however, contended further that all of the water flowing from the tail-race of the power plant of the Great Western Power Company was likewise devoted to irrigation purposes in the same general area, and evidence was offered to show that its predecessor power companies acquired some of their lands and water rights by exercise of the power of eminent domain for such purposes as well as for the generation of electricity, thus proving a dedication to the ·public use,· especially when followed by the institution of the water service. There were placed in evidence copies of complaints in six condemnation suits brought by the Western Power Company or Great Western Power Company, all of which alleged, in consonance with its articles of incorporation, that plaintiff was engaged in the business of furnishing and supplying water for the public use for domestic and irrigation purposes in addition to the generation of electric power and that it was necessary

to take the lands and water rights of the several defendants for each of such uses. Some of these cases were settled; others went to judgment and either the relief, as prayed for, was granted or the judgments expressly specified that the rights taken were to be applied by plaintiff to public purposes and uses. From this and other evidence the Commission concluded that the predecessors of Great Western Power Company of California intended to and did devote to the public use for irrigation the waters released after serving their function in the generation of electric power.

From a detailed and exhaustive review of still further evidence the Commission concluded that petitioners, Western Canal Company and Great Western Power Company of California, although one of them was organized as a mutual water company, nevertheless operated as public utilities in the sale and distribution of water for irrigation purposes, which fact is apparent from the acts of the companies themselves. A more extended reference to this phase of the subject follows at a later point in this discussion.

Thus, after a full and complete *résumé* of the evidence, the Commission announced that Great Western Power Company of California holds its property and water rights subject to the public use for irrigation and domestic purposes and is primarily responsible for the continuance of that public service; that Western Canal Company is not a mutual water company as defined in the Act for Regulation of Water Companies, but is wholly a creation of the power company and a device by which the latter has sought to escape public regulation; that the said complainant is entitled to the relief prayed for; that petitioners are "water corporations" within the definition and meaning of that term as used in the Public Utilities Act and the Act for the Regulation of Water Companies of the state of California and that an appropriate order should be entered directing them to file tariffs, rules and regulations governing the performance of the service in question. The order first herein discussed followed and petitioners thereupon instituted this proceeding, wherein they reiterate their claims as above set forth.

The briefs in this proceeding are thorough and exhaustive but, at the outset, we must observe that the existence of a public utility within the meaning of the law is in its essence a pure question of fact and we are mindful that

under section 23 of article XII of the Constitution and under section 67 of the Public Utilities Act, adopted pursuant thereto, we are circumscribed in our power of review over the orders of the Railroad Commission. (*Live Oak W. U. Assn.* v. *Railroad Com.*, 192 Cal. 132, 138 [219 Pac. 65].) The presumption of regularity is to be indulged with respect to its orders as is done with respect to judgments of courts. Likewise, findings of fact by it are to be accorded similar weight to that given verdicts of juries. (*Pacific Gas & Elec. Co.* v. *Devlin,* 188 Cal. 33 [203 Pac. 1058].) Therefore, if in the record before us there is to be found any substantial evidence to justify the decision of the Railroad Commission that petitioners are public utilities, its order cannot be annulled. (*Richardson* v. *Railroad Com.*, 191 Cal. 716 [218 Pac. 418]; *Butte County W. U. Assn.* v. *Railroad Com.*, 185 Cal. 218 [196 Pac. 265]; *Limoneira Co.* v. *Railroad Com.*, 174 Cal. 232 [162 Pac. 1033]; *Traber* v. *Railroad Com.*, 183 Cal. 304 [191 Pac. 366].) We fail to see a necessity for lengthy discussion of the evidence, which is set out at some length in the opinion of the learned Railroad Commission and summarized above. The mere review of the facts above set forth, which are undisputed, reveals a case where this court cannot interfere with the ruling of the Commission. ▇▇▇ We may say further that in our judgment these undisputed facts are in accord with the findings of the Commission on all three of the propositions discussed by it and upon which it rested its decision.

The sole ultimate question is whether petitioners are corporations "owning, controlling, operating or managing any water system" which "sells, leases, rents or delivers water to any person, firm, private corporation, municipality or any other political subdivision of the state whatsoever . . . " (Stats. 1913, p. 84) or are utilities covered by section 2dd of the Public Utilities Act as amended in 1919 (Stats. 1919, p. 493), or whether they come within the exception mentioned in the act of 1913 above quoted, which reads as follows: "Section 2. Whenever any private corporation or association is organized for the purpose solely of delivering water to its stockholders or members at cost, and delivers water to no one except its stockholders or members at cost, such private corporation or association is not a public utility, and is not subject to the jurisdiction, control or

regulation of the railroad commission of the State of California." Under this section come mutual water companies.

The record is replete with facts from which it might be concluded that the water rights and water system of the Feather River Canal Company were intentionally dedicated to a public service. ▮ The appropriation of the water for the avowed public use, the construction of the canal system for this same purpose, the offer to the public of water service as a utility and the making of contracts which obligated it to serve water to the contractees completed the dedication. (*Byington* v. *Sacramento, etc.*, 170 Cal. 124 [148 Pac. 791]; *Butte County W. U. Assn.* v. *Railroad Com., supra; Traber* v. *Railroad Com., supra.*) This public use having attached, its existence was not ended by the organization of the Feather River Mutual Water Company and the transfer of the assets of the utility to it. Consent of the Railroad Commission was necessary for abandonment of a public use so created. (*Van Hoosear* v. *Railroad Com.*, 184 Cal. 553 [194 Pac. 1003].)

The undisputed facts also warrant the conclusion that for public use for irrigation, as well as for power, the present power company, through its predecessors, sought and obtained its storage privileges on the Feather River. A fair construction of the eminent domain proceedings, both those that went to judgment and those settled by the passing of deeds prior to judgment, leave no doubt that the company had this active purpose in mind and sought and obtained a reservoir site for irrigation as well as for power purposes. This, too, was confirmed by the answer filed by it in an eminent domain proceeding against it, in which it set up the fact that these waters "about to be stored" were dedicated to irrigation as well as power uses. When, under these circumstances, water was sold for irrigation, even to a *bona fide* mutual water company, the power company became a utility for the sale of water for irrigation. Moreover, it is a natural process to impound water for power purposes and then dispose of it. after such use for irrigation purposes. It takes but little evidence to show that reservoired waters used for the generation of power for public sale are impressed with a public use for all other available purposes. As an agency of the state, the company gets the right to condemn and to store; from whence

comes the right in the utility to claim these waters, after use, as its personal and private property as against the state, whose agent it is in impounding and using them? It would seem that when these stored waters have been used and released to the original stream channel, they should still be impressed with a public use or else they should be open to the use of claimants on the stream below. In other words, we suggest the question: Is it not within the jurisdiction of the Commission to require that these waters, impressed with a public use, be continued as such for all available purposes in the hands at least of the utility in charge of them?

This brings us to the third and last proposition upon which the Commission based its action, as noted above, which seems to be of enough future importance to warrant a more extended consideration. As already noted, in 1914 negotiations were begun by the power interests to acquire the properties of the Feather River Canal Company and its allied corporation, the Feather River Mutual Water Company. An agreement of purchase was executed in October of that year and the sale was not consummated until August 17, 1915. The Western Canal Company was brought into existence on January 28, 1915, but even prior thereto and as early as January 1, 1915, it was engaged in making contracts with the power company. It is not disguised that the canal company was so organized as a subsidiary of and, in fact, it was the *alter ego* of the power company itself. To the power company was given a deed to the water rights of the Feather River companies and to the Western Canal Company was given a conveyance of the canal system and rights of way and franchises of said companies. All the consideration for the purchase was paid by the power company. There were left outstanding, to be taken care of by the purchasers, 5,000 water rights, some of which had already become appurtenant to certain lands.

The object of organizing the Western Canal Company was stated by the president of the power company to be as follows: Because the power company had been incorporated originally having as one of its objects the utilization of waters for irrigation and had constructed a dam and thus made captive a great volume of water and was confronted with the imperative necessity of causing it to

be utilized for irrigation and was in a hurry to do this to prevent claimants on the stream below the dam from asserting an interest therein; that accordingly they discovered a large area needing irrigation and they found the Feather River companies had made an unsuccessful attempt to meet this need; that an appraisal of the properties was made and they were found to be of a value of $250,000 and because, among other things, they had several miles of canal constructed and other rights of way obtained, the purchase was made. Following this a series of contracts was entered into between the power company and the canal company. These contracts appear in some five exhibits in the record, to wit: Nos. 68 to 72, inclusive, which exhibits counsel for the complainant has summarized correctly, as follows:

"First, comes Exhibit 68, dated January 1, 1915, an agreement in which the Power Company agrees to furnish water for irrigation to the Canal Company, when 'in its uncontrolled discretion' it has the water to spare, and subject to termination at any time for failure of the Canal Company to perform its obligations. The water is to be used 'by the Canal Company for sale to its consumers'. The Power Company reserves the right at any time to stop stock sales and thus limit water use. The maximum use in any event is to be 200,000 acres. The price is to be $150,000.00 per year until water sale revenues of the Canal Company equal $150,000.00 per year, the same to be a cumulative charge, at 6%, upon gross revenues. All gross revenues are to be paid to the Power Company until such indebtedness is paid in full. A minimum water rate is established, viz., $6.00 per acre for rice; $3.00 for alfalfa; $2.00 for other irrigation; but rates are to be always not less than $1.00 per acre-foot for any purpose. A standby minimum of $2.00 is to be collected, whether water is used or not. After the cumulative $150,000.00 per year at 6% has been fully paid, the Power Company is to receive all gross revenues, less 50 cents per acre for land irrigated. The Canal Company is limited to the use of Power Company water. Accounting is to be made monthly. All accounts, bills and claims for water are assigned to the Power Company as security and the Power Company is made attorney in fact to sue or otherwise collect them. The Power

Company agrees to extend and develop the system, and to maintain and repair the canal until the cumulative debt is paid. The effect of this agreement is to establish the Canal Company as the name under which the Power Company could sell water without regulation.

"Second, Exhibit 69 is an agreement dated November 21, 1917, between the Power Company and the Canal Company, modifying and construing the contract set forth as Exhibit 68, to the end that the cumulative obligation therein set up shall be payable only out of gross revenues and 'out of any other moneys received by and belonging to the Canal Company'. In effect, it means and very properly says that the agent shall not be required to turn in to the principal more than it is able to collect.

"Third, Exhibit 70, is an agreement dated March 5, 1915, between the Canal Company and the Power Company, witnessing the fact that the former is transferring to the latter all its capital stock, less 5050 shares, in exchange for the properties of the Feather River Mutual Water Company, plus additions to be made by the Power Company; and further providing that the Power Company will sell the stock upon demand to landowners at not less than $15.00 per share.

"Fourth, Exhibit 71, dated July 2, 1915, is an agreement between the Western Canal Company and the Feather River Canal Company and Feather River Mutual Water Company, in which the Canal Company agrees to issue 5000 shares of stock without cost to the second parties or their assigns to cover outstanding 'water rights', or commitments of second parties. This was the stock reserved at the time of sale to cover the various 'rights' originally issued to Norris. It is a recognition that such rights existed and provides a means of meeting them.

"Fifth, Exhibit 72 is an agreement dated July 2, 1915, between the same parties, providing that Feather River Canal Company and Feather River Mutual Water Company would save the Canal Company harmless from any demands for 'shares of stock or water rights' outstanding, save as they might be satisfied by the 5000 shares of Canal Company stock."

The canal company thus is made but an outlet for the sale of the stored waters of the power company at a profit,

first in the sale of the stock and, secondly in the sale of the water. The canal company has no possible chance of independent existence at any time, not even after a sale of all its stock by the power company, which fixes the price. Then, too, its obligation to pay for water it may never sell will keep it in serfdom for an untold period of time. Sixteen years of struggle finds it more deeply enthralled than in the beginning. In practical operation its status as an independent *ego* is even worse than these contracts would indicate. Practically all its officers have come from the administrative force of the power company and get their salaries from the latter company. The office equipment and location of both companies is the same. The home and fortune of the canal company, in short, is within the keeping of the power company. The canal company has no bank account apart from the power company. The power company owns eighty-four per cent of the stock of the canal company and, as such owner, dictates the latter's every act. This stock, too, is pledged as an asset of the power company to secure its own indebtedness. The canal company has no independent bookkeeping system recording its sales or the status of its contract or water accounts. No land-owning stockholder has ever been notified of or attended a meeting of the stockholders; only about four regular stockholders' meetings have been held in sixteen years. No stockholder without interest in the power company in some form has ever been on the board of directors of the canal company. The stock used to qualify the directors of the canal company is indorsed in blank to the power company. While the canal company has an appropriate set of by-laws, suitable for the management of a mutual water company, these by-laws have been in disuse. Instead of giving the canal company some voice over the price of its own stock, the power company provided a minimum and not a maximum price of $15 per share and some stock has been sold for as high as $35, the canal company being entirely and supinely helpless in this important matter. In short, the canal company has no voice in anything and its obligations to the parent company are increasing, with no signs of emancipation. Much further evidence of impotency of the canal company could be cited.

But it is claimed that the holding of this court in *Thayer* v. *California Dev. Co.*, 164 Cal. 117 [128 Pac. 21], would justify the conclusion that the canal company exists as a mutual water company. It is true that there are some points of superficial similarity in the two cases but there are at the same time marked differences in the organizations under consideration. In the Thayer case the court found as a fact, contrary to the situation here, that the mutual company had not been controlled or dominated by the development company. The domination here is complete. In the Thayer case the stock of the mutual company was sold for its own benefit; here the stock is sold for the exclusive benefit of the power company. In that case the mutual company did not, as here, give the parent company its whole capital stock and allow said company to pledge and traffic in it at will. Neither in the Thayer case, as here, was the power company authorized to stop the sale of stock at any time and thus be relieved *pro tanto* of the duty to furnish water. Neither in that case was the mutual company required to make water contracts at rates fixed by the parent company, as is the case here, nor did the mutual company there surrender bodily its management to the power company.

Moreover, the definition of a public utility has been somewhat enlarged by statute since the decision in the Thayer case. (See sec. 2dd, Public Utilities Act, *supra*.) This it was competent for the legislature to do. (*San Diego Land etc. Co.* v. *National City*, 174 U. S. 739, 753 [43 L. Ed. 1154, 19 Sup. Ct. Rep. 804].)

Cases showing the requirement of mutuality among the membership of a mutual water corporation and the apportionment of its operating costs among them are numerous. We cite a few: *Hildreth* v. *Montecito Water Co.*, 139 Cal. 22 [72 Pac. 395]; *Copeland* v. *Fairview Land & Water Co.*, 165 Cal. 148 [131 Pac. 119]; *Edwards Associates* v. *Railroad Com.*, 196 Cal. 62 [235 Pac. 647].

We think the Railroad Commission was well warranted in looking beyond the corporate forms which clothed the acts of petitioners and in declaring the canal company to be but the agent of the power company. (*Chicago etc. Co.* v. *Minneapolis*, 247 U. S. 490 [62 L. Ed. 1229, 38 Sup. Ct. Rep. 553]; *Ohio Min. Co.* v. *Public Utilities Com.*, 106 Ohio St.

138 [140 N. E. 143, 147], where it is said: "The facts disclose that the division of this whole property into three separate parts is a division by denomination only; that, while the ownership of the three plants is designated by such owners as separate, ownership is in fact the same; that the owners seek by resort to the fiction of corporate ownership to limit the effect of the dedication of the properties of their distributing companies to those companies alone; that, by reason of the fact that the whole is but one commonly owned property engaged in a single enterprise, the act of one nominal division thereof is attributable to all; and that the Southern Ohio Power Company, through its commonly owned associated corporations, the Athens Electric Company and the Hocking Power Company, is engaged in the selling of electric energy to consumers within the provisions of sections 614-2 and 614-2a, General Code, and is a public utility subject to the jurisdiction of the Public Utilities Commission of Ohio."

The position of the water using stockholders is treated in separate opinions this day filed. (*Albin et al.* v. *Railroad Com., post,* p. 655 [15 Pac. (2d) 860]; *Carlson* v. *Railroad Com., post,* p. 653 [15 Pac. (2d) 859].)

The order of the Railroad Commission is affirmed.

Rehearing denied.