[No. D043125. Fourth Dist., Div. One. Nov. 29, 2004.]

INDEPENDENT ENERGY PRODUCERS ASSOCIATION, INC., Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent.

■■■■

**COUNSEL**

Rodi, Pollock, Pettker, Galbraith & Cahill, C. Stephen Davis, Andrew Bodeau and Cris K. O'Neall for Plaintiff and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, W. Dean Freeman, Gregory S. Price, Felix E. Leatherwood and Leslie Branman-Smith, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**NARES, J.**—In this declaratory relief action the plaintiff Independent Energy Producers Association, Inc. (IEPA), which represents the interests of independent electric generating facilities, asserts that the California State Board of Equalization (the Board) improperly assessed certain of its members' property for taxation. IEPA asserts that after deregulation of the energy market in California in 1996, when utilities were required to sell off generating facilities, the Board improperly enacted a rule, which was codified by the Legislature in a statute, allowing the Board to assess some of these generating facilities on the basis that they were "public utilities" within the meaning of the California Constitution. In response, IEPA filed this action challenging the Board's assessment and brought a motion for summary adjudication of issues, contending that (1) the Board had no jurisdiction to assess such electric generating facilities as they are not "regulated public utilities"; and (2) the statutory authority for the Board's assessment of these generating facilities violated the terms of article XIII A, section 3 of the California Constitution (Proposition 13) as it was passed with less than a two-thirds vote by the California Legislature. The court denied IEPA's motion for summary judgment finding that (1) the Board has jurisdiction to assess the property of independent electric generators; and (2) its assessment of the electric generators did not violate Proposition 13. The parties and the court agreed that the court's decision covered the principal issues presented by IEPA's action and that judgment should therefore be entered in favor of the Board to facilitate an appeal.

On appeal IEPA asserts that the court erred in denying its motion for summary judgment as (1) under the California Constitution, the Board only has jurisdiction over regulated public utilities; (2) the independent electric

generating facilities are not public utilities; and (3) even if the Board had jurisdiction to assess independent electric generating facilities, it violated Proposition 13 because the change in assessment was not accomplished by a two-thirds vote of the Legislature. We affirm.

## FACTUAL BACKGROUND

The original Board, a creature of the 1870 Legislature, was intended to keep intercounty tax assessment levels uniform. (Stats. 1869–1870, ch. 489, p. 714.) In 1874, however, the California Supreme Court held that the Board's intercounty equalization functions were an unconstitutional delegation of power. (*Houghton v. Austin* (1874) 47 Cal. 646, 650–651.) The Board was thereafter reconstituted in the 1879 Constitution and given the specific power to raise and lower entire county assessment rolls to achieve equality among the counties. The Board's authority is now contained in article XIII, sections 17, 18 and 19 of the state Constitution. (All further article references are to the California Constitution.)

With regard to the Board's assessment of utilities, article XIII, section 19 of the California Constitution provides in part: *"The Board shall annually assess* (1) pipelines, flumes, canals, ditches, and aqueducts lying within 2 or more counties and (2) *property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity.* This property shall be subject to taxation to the same extent and in the same manner as other property." (Italics added.)

Prior to deregulation of the electric industry in 1996, "the electrical industry was vertically integrated, with traditional electric public utilities having monopoly rights to generate, transmit, distribute and sell electricity. Property owned and used by those public utilities, *including electric generation facilities*, was assessed by [the] Board." (State Bd. of Equalization, Final Statement of Reasons, amend. of Property Tax Rule 905 (Apr. 22, 2002) p. 1, italics added.) Deregulation "required the regulated public utilities to divest themselves of certain fossil fuel powered generation facilities. At the same time, a number of new generation facilities were being constructed with the purpose of entering into the wholesale electricity market." (*Id.* at pp. 1–2.)

Questions thereafter arose as to whether the purchasers of such facilities would be assessed for property tax purposes by state or local authorities. The Board initially considered assessing electric generating facilities with a capacity of 50 megawatts or more; facilities with less capacity would be assessed at the county level. (State Bd. of Equalization, Property Taxes Com., Formal Issue Paper No. 98-032 (Nov. 13, 1998) p. 1.) The Board determined

that article XIII, section 19 had always been interpreted as applying only to public utilities, but that independent electric generating facilities had all the characteristics of public utilities. (State Bd. of Equalization, Property Taxes Com., Formal Issue Paper No. 98-032, *supra*, p. 1.) The Board also noted, however, that it also had the power to decline to exercise its jurisdiction over certain companies and their facilities even if they came within the definition of a "public utility." (*Ibid.*)

In the end, however, after a period of extensive comment, the Board in 1999 elected to promulgate a new regulation (Cal. Code Regs., tit. 18, § 905 (Original Rule 905)), which provided that the only electric generation facilities that would be state assessed were those (1) constructed pursuant to a certificate of public convenience and necessity (CPCN) issued by the California Public Utilities Commission (CPUC), or (2) that were owned by companies otherwise subject to state assessment. (State Bd. of Equalization, Final Statement of Reasons, amend. of Property Tax Rule 905, *supra,* p. 2.) All other generation facilities would be assessed by the county assessor in the county in which the facility was located. (*Ibid.*) Original Rule 905 provided in this regard: "An electric generation facility shall be state assessed property for purposes of article XIII, section 19 of the California Constitution if: (1) the facility was constructed pursuant to a certificate of public convenience and necessity issued by the [CPUC] to the company that presently owns the facility; or, (2) the company owning the facility is a state assessee for reasons other than its ownership of the generation facility or its ownership of pipelines, flumes, canals, ditches, or aqueducts lying within two or more counties." (Cal. Code Regs., tit. 18, § 905 (eff. Nov. 27, 1999).)

However, in November 2001 (eff. beginning in 2003), as a result of the "energy crisis" in California, the Board issued an amended rule 905 (Amended Rule 905) to take back from the county assessors the assessment of certain generation facilities that had a generating capacity of 50 megawatts and whose owners would be defined as electric corporations or were otherwise subject to assessment by the Board: "(a) Commencing with the assessment for the lien date for the 2003 assessment year, an electric generation facility shall be state assessed property for purposes of article XIII, section 19 of the California Constitution if: (1) the facility has a generating capacity of 50 megawatts or more; and (2) is owned or used by a company which is an electrical corporation as defined in subdivisions (a) and (b) of section 218 of the Public Utilities Code; or, the facility is owned or used by a company which is a state assessee for reasons other than its ownership of the electric generation facility or its ownership of pipelines, flumes, canals, ditches, or aqueducts lying within two or more counties. [¶] (b) 'Electric generation facility' does not include a qualifying small power production facility or a qualifying cogeneration facility . . . ." (Cal. Code Regs., tit. 18, § 905 (eff. June 13, 2002).)

In 2002 the Legislature adopted Assembly Bill No. 81 (2001–2002 Reg. Sess.) (Bill No. 81), adding Revenue and Taxation Code section 721.5, which codified Amended Rule 905: "[C]ommencing with the lien date for the 2003–04 fiscal year, the board shall annually assess every electric generation facility with a generating capacity of 50 megawatts or more that is owned or operated by an electrical corporation . . . ."

The immediate result was that, beginning in 2003, numerous electric generating facilities that were divested by public utility companies following deregulation and were subject to local assessment under Original Rule 905 would now be state assessed. Newly constructed postderegulation plants would be similarly assessed. Initially, 44 independent electric generating facilities were designated to become subject to the Board's assessment as of January 1, 2003. It is the state assessment of these independent electric generating facilities that IEPA challenges on this appeal.[1]

## PROCEDURAL BACKGROUND[2]

IEPA, a trade association representing the interests of independent electric generating facilities, filed a complaint for declaratory relief to determine the validity of Bill No. 81 and Amended Rule 905 pursuant to Government Code section 11350, Code of Civil Procedure section 1060, and Revenue and Taxation Code section 4808. The complaint stated two causes of action. The first was directed at the scope of the Board's assessment jurisdiction. It sought a declaration that the phrase "regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity" contained in article XIII, section 19 meant that the Board was limited to assessment of "regulated public utilities"; that Bill No. 81 and Amended Rule 905 were unconstitutional and void; and that an electric generation facility could be centrally assessed by the Board under article XIII, section 19 only if the facility was constructed pursuant to a CPCN issued by the CPUC to the company that owned the facility or the company owning the facility was already a state assessee for reasons other than its ownership of the generating facility, i.e., under the conditions specified by the Original Rule 905.

The second cause of action was pleaded in the alternative and addressed the applicability of Proposition 13 to generators of electricity in the event that Bill No. 81 and Amended Rule 905 were found to be constitutional. The second cause of action sought a declaration that the independent generators

---

[1] In its complaint, IEPA alleged that it represented the interests of "more than 35" electric generating facilities impacted by Amended Rule 905 and Bill No. 81.

[2] Because the Board agrees with the IEPA's recitation of the procedural history of this matter, we take our procedural background from IEPA's appellant's opening brief.

could not be assessed by the Board under the principle of unitary assessment, but instead were to be assessed as discrete combinations of real and personal property subject to Proposition 13.

IEPA filed a motion for summary adjudication of issues. The court denied the motion, concluding that independent generators fell within the definition of public utility used in article XII, section 3 because they are producers of power: "Does [Assembly Bill No.] 81 and/or Rule 905, promulgated pursuant to the provisions of [Assembly Bill No.] 81, violate Article XIII, section 19, of the California Constitution? Article XIII, section 19, allows the legislature to add additional public utilities to the [Board] *for assessment purposes.* Based on the definitions of public utilities as found in Article XII, section 3, plaintiffs appear to fall within the definition of a public utility in that they are producers of power. Whether plaintiffs are or are not public utilities, as defined by *Story* [*v. Richardson* (1921) 186 Cal. 162 [198 P. 1057] (*Story*)] or an attorney general's opinion, is but superfluous to this decision as plaintiffs herein appear simply and clearly to be producers of energy covered by Article XII, section 3. As an aside, case authority such as [*Story*] appears to hold that if a producer of power in fact does not confine its sales to private individuals, it is or can be considered a public utility. Again, per the declaration of Andrew Brown, and Exhibit B thereto, at least 21 of 43 companies have [Department of Water Resources] contracts."

The trial court also rejected IEPA's assertion that Bill No. 81 changed the method of tax and thus required a two-thirds vote of the Legislature pursuant to Proposition 13: "Article XIII A, section 3, requires at least two-thirds vote of all members elected to each of the two houses of the Legislature in order to effect 'any change in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation.' Is [Bill No. 81] such a tax change measure? [Bill No. 81] does not itself specify an increase in the tax rate, nor does it embody in its terms a change in the methods of computation. It does change for plaintiffs the body having jurisdiction to assess taxes, from counties to the [Board]. The [Board] is a body distinct from the CPUC which has jurisdiction to assess rate-regulated public utilities. The method, fair market value x 1%, is the method of calculation used by *both* the counties and the [Board] at all relevant times both before and after 'deregulation'. The fact that such change in assessor may result in a tax increase or was intended by some to result in a tax increase does not in itself transform this piece of legislation into a tax change regulation. If the result of [Bill No. 81] is a higher or lower tax paid by plaintiff in a particular year, it is but fortuitous. Proposition 13 protection, as may or would be afforded to plaintiffs is they continued to be assessed by the counties, would be lost however."

Counsel for both parties and the court concurred that the essential issues in IEPA's complaint had been decided by the court's denial of IEPA's motion. The parties therefore consented to entry of judgment in the Board's favor in order to facilitate an appeal following the court's determination of the issues presented. IEPA's timely appeal followed.

## DISCUSSION

Three core issues are presented by IEPA's appeal. First, is the Board's jurisdiction limited to assessment of "public utilities"? Second, are independent generating facilities "public utilities" within the meaning of article XII, section 3? Third, did Bill No. 81 effect a tax increase on the facilities' property and thereby violate Proposition 13 as not having been passed by a two-thirds majority of the Legislature?

We first conclude that the board's jurisdiction under article XIII, section 19 is limited to public utilities. Second, we hold that the independent electric generating facilities at issue in this litigation meet the definition of public utilities. Third, we conclude that Bill No. 81 did not violate Proposition 13.[3]

### I. *Standard of Review*

■ Where, as here, the facts are undisputed, we independently review the construction and application of the disputed statute to the undisputed facts. (*Murphy v. Padilla* (1996) 42 Cal.App.4th 707, 711 [49 Cal.Rptr.2d 722]; see also *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1502 [82 Cal.Rptr.2d 368] ["We independently construe statutory law, as its interpretation is a question of law on which we are not bound by the trial court's analysis"].)

### II. *Principles of Statutory Interpretation*

Because our analysis of the issues raised by this appeal requires our interpretation of statutes and the California Constitution, we begin with a discussion of some of the applicable principles of statutory interpretation.

### A. *Plain Language of Article XIII, Section 19*

■ "We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.]

---

[3] On March 4, 2004, IEPA filed a motion requesting that we take judicial notice of two documents. Those documents were the Board's Recommendation for Assessment of State-Assessed Property, dated January 1, 2003, and a report to then-Governor Gray Davis from the chairman of the Electricity Oversight Board and the president of the CPUC, dated August 2, 2000. We ordered that the motion be considered with this appeal. However, as it was unnecessary to rely on those documents in this opinion, we need not address that motion.

'In determining intent, we look first to the language of the statute, giving effect to its "plain meaning." ' [Citations.] Although we may properly rely on extrinsic aids, we should first turn to the words of the statute to determine the intent of the Legislature. [Citation.] Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; see also *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299] ["If the [statutory] language is clear and unambiguous[,] there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature"].) The rules of statutory construction apply equally to constitutional provisions. (*Pipe Line Co. v. State Bd. of Equalization* (1936) 5 Cal.2d 253, 256 [54 P.2d 18].)

### B. *Legislative Intent*

 "[I]f the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.] In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003 [111 Cal.Rptr.2d 564, 30 P.3d 57]; see also *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1165–1166 [278 Cal.Rptr. 614, 805 P.2d 873].) The legislative history of article XIII, section 19 is entitled to great weight. (See *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 16–18 [26 Cal.Rptr.2d 834, 865 P.2d 633].)

### III. *Article XIII, Section 19 Allows Assessment of Only Public Utilities*

 From the plain language of article XIII, section 19, it would appear that the Board has the power to assess all "companies transmitting or selling gas or electricity," including independent electric generators, regardless of whether they constitute "public utilities." However, a historical review of article XIII, section 19 (and in particular its predecessor article XIII, section 14) demonstrates that despite what appears to be the clear language of section 19, it has always been interpreted as giving assessment jurisdiction to the Board only over public utilities.[4]

---

[4] Although IEPA throughout its opening brief phrases the issue as whether article XIII, section 19 applies only to *regulated* public utilities, in its reply brief IEPA admits that whether

## A. *The 1910 Constitutional Amendment and* Story *Decision*

The Board's assessment authority over public utilities which sell electricity was first established in 1910, when the state Constitution was amended to replace the locally administered property tax with a centrally controlled "in-lieu" tax on certain types of businesses, including public utilities. The 1910 amendment, creating article XIII, section 14, is the predecessor provision to the current article XIII, section 19. As amended in 1910, article XIII, section 14 provided in part: "Taxes levied, assessed and collected as hereinafter provided upon railroads, . . . car companies . . . companies doing express business on any railroad, steamboat, vessel or stage line in this state; telegraph companies; telephone companies; *companies engaged in the transmission or sale of gas or electricity*; insurance companies; banks, banking associations, savings and loan societies, and trust companies; and taxes upon all franchises of every kind and nature, shall be entirely and exclusively for state purposes, and shall be levied, assessed and collected in the manner hereinafter provided." (Italics added.)

In *Story, supra,* 86 Cal. 162, the California Supreme Court considered whether article XIII, section 14 covered the owner of an office building who supplied electrical energy to tenants of his own building, as well as to nontenants occupying nearby property. The Board attempted to assert assessment jurisdiction to assess his sales of electricity. In response Story argued that, despite the broad language of article XIII, section 14, the state's constitutional authority was limited to the assessment of "public utilities." The Supreme Court agreed with Story, holding the assessment invalid because he was not a public utility for purposes of article XIII, section 14. In doing so, the high court reviewed the legislative history of article XIII, section 14, and gave strong weight to printed ballot arguments and the report of an appointed Constitution Revision Commission in interpreting its language. (*Story, supra,* 186 Cal. at pp. 165–166.) After reviewing this legislative history, the high court determined that article XIII, section 14's authority to assess "transmitters of electricity" was intended to apply only to "public utilities": "The provision of the constitution here under consideration was adopted by the people of the state at the election of November, 1910, as the result of a movement to separate state and local taxation. In 1905 a commission was authorized to investigate the system of revenue and taxation in force in this state and recommend a revision thereof. (Stats. 1905, p. 390.) The commission appointed proposed an amendment to the constitution. . . . [Citation.] The amendment as adopted was fundamentally the same as that

---

an entity is regulated or not does not affect our determination of whether article XIII, section 19 applies only to utilities. Rather, IEPA raises the issue of whether the facilities are "regulated" in its discussion of whether the independent electric generating facilities meet the definition of "public utilities."

proposed by the commission in its report in 1906 . . . . The commissioner recommended a separation of the sources of state and county revenue and that the property of certain 'public utilities' and certain 'other corporations,' namely, banks and insurance companies, be taxed solely for the benefit of the state. The theory of the report was that an *ad valorem* system of taxation was unsatisfactory in that it failed to distribute equally the burden of taxation, particularly in view of the fact that in certain cases, such as public utilities, banks, and insurance companies, the greatest value lay in the extent and nature of operation rather than in the intrinsic worth of separate items of property. Accordingly, a uniform scheme was proposed for the taxation of certain enumerated public utilities, including electrical companies, and that system was that the tax should equal a certain percentage of gross receipts; special methods were prescribed for the taxation of banks and insurance companies. Throughout the report electrical companies were classified and discussed as one group of 'public utilities' to be taxed upon gross receipts. In the printed arguments submitted to the voters in 1910, at the time the constitutional amendment was voted upon, the 'gross receipts' method of taxation was advocated solely for public utilities. *It is clear both from the report of the commission proposing the amendment and the arguments advanced to those voting upon the adoption of the amendment, as well as from the nature of the amendment, that the provision for taxation in proportion to gross receipts is applicable only to public utilities.*" (*Story, supra,* 186 Cal. at pp. 165–166, italics added; see also *Hobart Estate Co. v. Waters* (1934) 220 Cal. 669, 675 [32 P.2d 613] [" 'The cases are numerous to the effect that to remove property from local taxation and place it under the jurisdiction of the [Board] . . . the property must be used exclusively in the operation of a public utility . . . .' "]; *City of Oakland, Cal. v. F.E.R.C.* (9th Cir. 1985) 754 F.2d 1378, 1380.)

The high court then held that the plaintiff was not a public utility because he had not devoted his facilities to public use: " 'The essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefiniteness or unrestricted quality that gives it its public character.' " (*Story, supra,* 186 Cal. at p. 167, quoting *Thayer v. California Development Co.* (1912) 164 Cal. 117, 127 [128 P. 21] (*Thayer*).) The court concluded that "[t]here was no such general offer on the part of plaintiff. Plaintiff's plant was designed primarily and pre-eminently for supplying service to the tenants of his own building, and the special sales of electrical energy and steam were wholly subsidiary and ancillary to this main purpose." (*Story, supra,* 186 Cal. at p. 167.)

B. *The 1933 Constitutional Amendment*

The Great Depression devastated California's economy. In response, there was proposed a combination of tax increases and property tax relief known as the Riley-Stewart Tax Plan. A key provision of the Riley-Stewart Tax Plan was to repeal the gross receipts tax imposed on public utilities put into effect in 1910. Under the new approach, the Board would commence ad valorem assessment of utility and railroad property. (*ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 862–863 [210 Cal.Rptr. 226, 693 P.2d 811] (*ITT World Communications*).)

The Riley-Stewart Tax Plan amended article XIII, section 14. However, as amended, article XIII, section 14, retained its pertinent language as to the scope of the Board's assessment authority that had previously been interpreted to include only public utilities: "All pipe lines, flumes, canals, ditches and aqueducts not entirely within the limits of any one county, and all property, other than franchises, owned or used by . . . *companies engaged in the transmission or sale of gas or electricity*, shall be assessed annually by the State Board of Equalization, at the actual value of such property." (Italics added.)

After the Constitution was amended in 1933, the California Supreme Court again construed this language of article XIII, section 14 to apply only to public utilities. (*Pipe Line Co. v. State Bd. of Equalization, supra,* 5 Cal.2d at p. 255 ["[T]here are two classes of property enumerated in the section—first, pipe lines, flumes, etc., and, second, all property, other than franchises, *of public utilities*", italics added].)

C. *California Attorney General Interpretation*

In the 1950's, the California Attorney General construed article XIII, section 14, despite its broad language, as applying only to public utilities: "Although section 14 on its face would appear to require the assessment by the State Board of Equalization of all property owned or used by all companies engaged in the transmission or sale of gas or electricity regardless of whether they are public utilities, the history of the constitutional provision and the contemporaneous and long-continued administrative construction afforded it indicate that it should not be so construed. [¶] Upon investigation, we have found that the State Board of Equalization has consistently over the years assessed the property only of those 'companies engaged in the transmission of gas or electricity' under Certificates of Public Convenience and Necessity issued by the California Public Utilities Commission (see section 216 and sections 1001, et seq. of the Public Utilities Code). It has not attempted to assess the property of a company not so certificated, as it has

construed the constitutional language in question as inapplicable to companies [which are] not public utilities." (29 Ops.Cal.Atty.Gen. 77, 78 (1957), italics omitted.)

### D. *The 1974 Constitutional Amendment*

In 1974, article XIII, section 14 was amended and renumbered as the current article XIII, section 19. However, the 1974 amendment was not substantive. The text of article XIII, section 19, as it now reads, provides in part: "The Board shall annually assess . . . property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and *companies transmitting or selling gas or electricity. . . .* [¶] . . . [¶] The Legislature may authorize Board assessment of property owned or used by other *public utilities.*" (Italics added.)

■ Comparing former article XIII, section 14 with section 19, in light of the legislative history of section 14, it is apparent that article XIII, section 19 was intended to have the same meaning as article XIII, section 14. The purpose of the amendment was only to modernize and streamline language by eliminating legalese. There was no substantive change in the meaning of the provision. Under settled rules of construction, we must therefore presume that the courts' previous interpretation of former article XIII, section 14 was preserved and reincorporated into the Constitution when the voters adopted the substance of that provision as the current article XIII, section 19. (*Sarracino v. Superior Court* (1974) 13 Cal.3d 1, 8 [118 Cal.Rptr. 21, 529 P.2d 53] [adoption of constitutional language similar to former constitutional provision presumed to incorporate authoritative judicial construction of former language]; *In re Harris* (1989) 49 Cal.3d 131, 136 [260 Cal.Rptr. 288, 775 P.2d 1057] [drafters of initiative measure and voters deemed to know judicial construction of law serving as its source].)

■ After the 1974 amendment, the California Supreme Court reiterated its longstanding interpretation that Board assessment jurisdiction under article XIII, section 19, applied only to public utilities: "[T]he purpose of article XIII, section 19, is broadly to authorize the unit taxation of *public utility property* . . . and more narrowly to '[assure] adequate valuation of *utility property.*' " (*ITT World Communications, supra,* 37 Cal.3d at p. 870, italics added.)

■ In sum, the statutory history of article XIII, section 19 reveals that, despite the broad language granting assessment jurisdiction over "companies transmitting or selling gas or electricity," that phrase has always been interpreted to mean only "public utilities."

### IV. *Independent Electric Generators Are Public Utilities*

Now that we have determined that the legislative history of article XIII, section 19 and its predecessor allow only public utilities to be assessed by the Board, we must turn to the core issue on this appeal: Are independent electric generation facilities considered "public utilities" within the meaning of the California Constitution? As we shall explain below, they fall within the definition of utilities as they are entities that have dedicated their property for the provision of power to the public.

Article XII, section 3 provides the following definition of public utilities: "Private corporations and persons that own, operate, control, or manage a line, plant, or system for the transportation of people or property, the transmission of telephone and telegraph messages, *or the production, genera-* *tion, transmission, or furnishing of heat, light, water, power, storage, or* *wharfage directly or indirectly to or for the public,* and common carriers, *are* *public utilities subject to control by the Legislature. The Legislature may* *prescribe that additional classes of private corporations or other persons are* *public utilities.*" (Italics added.)

The statutory definition of public utility established by the Public Utilities Code is similar: "(a) 'Public utility' includes every . . . electrical corporation . . . where the service is performed for, or the commodity is delivered to, the public or any portion thereof." (Pub. Util. Code, § 216, subd. (a).)

■ However, although not expressly contained in article XII, section 3, the state Constitution also requires a dedication to public use to transform private businesses into a public utility. (*Allen v. Railroad Commission* (1918) 179 Cal. 68, 85, 89 [175 P. 466] (*Allen*); *Associated etc. Co. v. Railroad* *Commission* (1917) 176 Cal. 518, 523 [169 P. 62]; *Frost v. Railroad* *Commission* (1925) 197 Cal. 230, 236–237 [240 P. 26], revd. on other grounds in *Frost v. Railroad Commission of State of California* (1926) 271 U.S. 583 [70 L.Ed. 1101, 46 S.Ct. 605].) Case law has also recognized that the Legislature, by its repeated reenactment of the definition of public utilities without change, has accepted and adopted dedication as an implicit limitation on that term. (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 413 [67 Cal.Rptr. 97, 438 P.2d 801]; *Richfield Oil Corp. v. Public* *Util. Com.* (1960) 54 Cal.2d 419, 428–430 [6 Cal.Rptr. 548, 354 P.2d 4] (*Richfield Oil*).)

■ The test for determining whether dedication has occurred is "whether or not [a person has] held himself out, expressly or impliedly, as engaged in the business of supplying [a service or commodity] to the public as a class, not necessarily to all of the public, but to any limited portion of it,

such portion, for example, as could be served by his system, as contradistinguished from his holding himself out as serving or ready to serve only particular individuals, either as [an] accommodation or for other reasons peculiar and particular to them." (*Van Hoosear v. Railroad Commission* (1920) 184 Cal. 553, 554 [194 P. 1003] (*Van Hoosear*).) As the California Supreme Court stated in finding that the landlord in *Story* was not a public utility: " 'The essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefiniteness or unrestricted quality that gives it its public character.' " (*Story, supra,* 186 Cal. at p. 167, quoting *Thayer, supra,* 164 Cal. at p. 127.) The court concluded that "[t]here was no such general offer on the part of plaintiff. Plaintiff's plant was designed primarily and pre-eminently for supplying service to the tenants of his own building, and the special sales of electrical energy and steam were wholly subsidiary and ancillary to this main purpose." (*Story, supra,* 186 Cal. at p. 167.)

Further, whether or not dedication has occurred is a factual issue, to be determined on a case-by-case basis. Courts caution that " '[t]o hold that property has been dedicated to a public use is "not a trivial thing" [citation], and such dedication is never presumed "without evidence of unequivocal intention." ' " (*Allen, supra,* 179 Cal. at p. 85.) However, such dedication may be inferred from action and need not be explicit. (*Greyhound Lines, Inc. v. Public Utilities Com., supra,* 68 Cal.2d at p. 414, citing *Yucaipa Water Co. No. 1 v. Public Utilities Com.* (1960) 54 Cal.2d 823, 827 [9 Cal.Rptr. 239, 357 P.2d 295].)

Under the test for dedication to public use required for public utilities expressed in *Van Hoosear*, the electric generation facilities at issue meet the test. They are operated for the purpose of selling electricity in the competitive public marketplace, i.e., they have dedicated their facilities to generating and selling power to the public. Indeed, much of the power generated by these facilities was committed to contracts entered into with a public agency, the Department of Water Resources (DWR), for use by the public at large. Pursuant to those contracts, they are obligated to deliver this power on demand. Many of the facilities have been constructed with the assistance of public funds and commitments from public agencies. The facilities were constructed after site certification and regulation by the California Energy Commission. As the Board stated in determining that Amended Rule 905 properly assessed the electric generation facilities as public utilities: "In the Board's view, there is no question that the generation facilities that would be Board assessed under the amended Rule will produce, generate, and/or transmit power directly or indirectly to the public. For example, we are advised by the staff of the California Energy Commission that approximately 90% of the available generation capacity of the plants subject to the long-term contracts with DWR are covered by the contracts. That power was

purchased by a public agency on behalf of the public for transmission to the public. Other generation facilities in question are operated for the purpose of selling electricity in the competitive public marketplace. The other facilities must use the statewide grid to sell their power to the public. Companies owning the generation facilities covered by the Rule are, therefore, public utilities within the meaning of the Constitution."

These facts compel the conclusion that the generation facilities at issue on this appeal meet the dedication requirements to be considered public utilities.

IEPA asserts that independent generators of electricity are not public utilities because "they have never dedicated their property to the public." However, IEPA submits no evidence in support of this contention or explanation why the above evidence is not sufficient to show public dedication. Rather, IEPA only argues that DWR contracts do not make independent generators public utilities, as merely selling electricity does not render the seller a public utility.

 It is true as IEPA contends that in and of itself selling electricity does not result in a dedication sufficient to make an entity a public utility. (*Thayer, supra,* 164 Cal. at pp. 126–128 [merely selling water does not result in dedication of water rights to public use]; *Nevada-California Power Co. v. Borland* (1926) 76 Cal.App. 519, 523–524 [245 P. 209] (*Nevada-California Power*) [generating electricity alone does not constitute dedication to public]; *Richfield Oil, supra,* 54 Cal.2d at pp. 438–440 [selling natural gas does not alone establish dedication to public]; *Story, supra,* 186 Cal. at p. 167 [merely selling electricity does not establish dedication].) However, in each of these cases where the party was found not to be a public utility, it either sold its product to only a few select individuals or entities, not to the public at large, or did not sell to the public in California. (*Thayer, supra,* 164 Cal. at p. 132 ["It appears, therefore, that the Development Company has always, either directly or through the auxiliary companies, selected the persons to whom it would sell and distribute the water and fixed its own prices. A use thus restricted, limited, and controlled by the owner . . . is in no proper sense . . . a public use"]; *Story, supra,* 186 Cal. at p. 167 [landlord who sold electricity to only tenants and select occupants of nearby buildings]; *Nevada-California Power, supra,* 76 Cal.App. at pp. 523–524 [power generated for public use in Nevada, not California].) In *Richfield Oil, supra,* 54 Cal.2d at pages 438–440, the court merely held that in determining an oil and gas producer's public utility status, it was required to distinguish between that portion of its business not dedicated to public use and that portion where it supplied excess reserves to utilities, which might be considered a public dedication.

 Where, as here, the electric generation facilities supply electricity to the general public, they are considered to have made a dedication of their

property to the public so as to be considered a public utility. For example, with regard to water suppliers, public dedication was found in one case where there was appropriation of water for an avowed public use, construction of a canal system for the same purpose, offer to the public of water service as a utility, and making of contracts obligating the company to serve water to contractees. (*Western Canal Co. v. Railroad Commission* (1932) 216 Cal. 639, 647 [15 P.2d 853]; see also *Williamson v. Railroad Commission* (1924) 193 Cal. 22, 29–30 [222 P. 803].)

 Further, if the public nature of the business activity is established, it matters not that sales are to only a few customers or that the entity only indirectly serves the public by making sales to a utility: "[A] utility that has dedicated its property to public use is a public utility even though it may serve only one or a few customers or a utility that in turn serves the public . . . a public utility that has been serving the public directly remains such even though it turns its distributing system over to a publicly or privately owned utility and thereafter limits its own business to supplying the utility that directly serves the public." (*Richfield Oil, supra,* 54 Cal.2d at p. 431; see also *Commercial Communications v. Public Util. Com.* (1958) 50 Cal.2d 512 [327 P.2d 513].)

IEPA has not attempted to show that independent electric generators do not provide a service or commodity to the public as a class, as distinguished from provision to only particular individuals as only an accommodation or with contracts peculiar to those individuals. Thus, the generating facilities at issue in this case meet the public dedication requirement of public utilities. (*Van Hoosear, supra,* 184 Cal. at p. 554.)

IEPA then argues that independent electric generators are not utilities because the Legislature, Board and CPUC have acknowledged that they are not. However, IEPA's citations do not support its position.

IEPA first cites to the legislative history of Bill No. 81 for the proposition that the Legislature characterized independent generators as "non-utilities." IEPA cites the following passage: "The bill is intended to transfer the assessment responsibility for *non-utility-owned electric generating facilities* from local assessors to [the Board]." (Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 81 (2001–2002 Reg. Sess.) May 20, 2002, p. 4, italics added.) IEPA then cites the following passage from the Senate Revenue and Tax Committee: "The 1996 electric deregulation legislation (AB 1890) required public utilities to divest themselves of their major generating facilities. As a result 22 *generating facilities were sold by utilities to non-utility power companies.* . . . [¶] . . . [¶] The bill is intended to transfer the assessment responsibility for *non-utility owned electric generating facilities* from local assessors to the State Board of Equalization." (Sen. Rev. &

Tax. Com., Analysis of Assem. Bill No. 81 (2001–2002 Reg. Sess.) July 1, 2001, pp. 1–2, italics added.)

A plain reading of these provisions does not support IEPA's assertion. Rather, these passages only stated that with deregulation, utilities sold the generating facilities to nonutility power companies. They did *not* say that the generating facilities themselves could not be considered utilities under the California Constitution, applicable statutes or case law.

In its opening brief IEPA next purports to quote a Board staff report regarding the then pending Original Rule 905 for the same proposition: " '[[T]he Board does not currently assess . . . industries [that] do not operate under a CPCN from the California Public Utilities Commission and are not rate regulated . . . .] *Since its enactment,* [article XIII,] *section 19 and its antecedent provisions have been interpreted and understood to define and apply to assessment of "public utilities."* Indeed, [article XIII,] section 19 refers to "other public utilities" in the next to the last paragraph of that section. It is true the Legislature has determined that the sole fact of owning or operating an IOC [Investor Owned Companies] generation facility does not make an IOC a public utility for purposes of regulation [Pub. Util. Code section 216, subd. (g)]; . . . *[Currently, the basic test for state assessment used by the Board is whether a company selling electricity is required to operate under a CPCN or comparable license . . . .]' "* (Italics added by IEPA.)

However, as indicated from the brackets we have placed in the above quote from IEPA's brief, IEPA misquotes this passage. The first bracketed sentence is from page three of the document and the sentences that follow it are from page six, thus taking the statements out of context. (State Bd. of Equalization, Property Taxes Com., Formal Issue Paper No. 98-032, *supra,* at pp. 3, 6.) The bracketed last sentence does not appear in the quoted paragraph. Rather, the sentence that ends with a citation to the Public Utilities Code is followed by a semicolon and the passage "however, for the purpose of determining assessment jurisdiction, these companies owning generation facilities *have most of the characteristics of a public entity.* Further, these generation plants *are within the definition of public utilities set out in Article XII, section 3, of the California Constitution . . . .*" (State Bd. of Equalization, Property Taxes Com., Formal Issue Paper No. 98-032, *supra,* at p. 6, italics added.) Thus, an accurate quotation of the paragraph actually supports the Board's position as it stated that independent generating facilities have the characteristics of public utilities and are within the constitutional definition. The second bracketed sentence that IEPA added to the quote appears three paragraphs away at the bottom of page six. This sentence, combined with the sentence that follows it, again supports the Board's position: "Currently, the basic test for state assessment used by the Board is whether a company selling

electricity is required to operate under a CPCN or comparable license. While that test has worked well over the years, *the advent of restructuring suggests a revision of the Board's position on this issue, and it is within the Board's authority to make a revision.*" (*Ibid.*, italics added.) Thus, again, an accurate quote of the passage reveals that the Board was reflecting on prederegulation policy, and the fact that the Board could and should change its test as generating facilities, after deregulation, would not be operating under a CPCN anymore. Further, that paragraph discussed the fact that the Board had the power and jurisdiction to assess generating facilities as public utilities or, in its discretion, to decline to exercise such discretion.

IEPA also quotes the following passage from the Board's Final Statement of Reasons for Original Rule 905: "Rule 905 is consistent with [the] analysis [that the Board's authority regarding the assessment of electric companies is to assess electric public utilities] in that there is county assessment *of the electric generation plants that are not operated by, or as, traditional public utilities.*" (Italics added.) However, that quote is merely a short response to a comment from the public concerning Original Rule 905. Moreover, as acknowledged by that final statement of reasons, before enacting Original Rule 905, the Board also considered state assessment of generating facilities producing significant amounts of electricity, as the Amended Rule 905, at issue in this litigation, eventually did. (State Bd. of Equalization, Final Statement of Reasons re Property Tax Rule 905 (May 27, 1999) p. 1.) When considering which assessment to choose, the Board noted that it had the jurisdiction to assess electric generation facilities as public utilities, but also had the *discretion* to decline jurisdiction, as it did with the Original Rule 905. (State Bd. of Equalization, Property Taxes Com., Formal Issue Paper No. 98-032, *supra*, at pp. 5–6.)

IEPA next asserts that in order to be considered a public utility, an entity must be regulated by the CPUC and must receive from that entity a CPCN. In support of this, IEPA cites a 1915 California Supreme Court decision that held that a CPCN is a condition precedent to operating a public utility business and that a CPCN is the manner in which the government exercises its affirmation of a dedication to public use essential to the attainment of the status of a public utility. (*Oro Electric Corp. v. R. R. Commission* (1915) 169 Cal. 466, 475 [147 P. 118].) IEPA then asserts that because the CPUC has not issued a CPCN to the independent generators, and they are not regulated by the CPUC, they cannot be public utilities.

However, the case cited by IEPA was published in 1915, long before deregulation, at a time that all entities that sold electricity to the general public and therefore could be considered public utilities were regulated by the CPUC. The advent of deregulation allowed companies other than CPUC-

regulated companies to operate electric generation facilities and sell electricity to the public. As we noted above, the Board explained this difference when enacting Original Rule 905: "Currently, the basic test for state assessment used by the Board is whether a company selling electricity is required to operate under a CPCN or comparable license. While that test has worked well over the years, *the advent of restructuring suggests a revision of the Board's position on this issue, and it is within the Board's authority to make a revision.*" (State Bd. of Equalization, Property Taxes Com., Formal Issue Paper No. 98-032, *supra,* at p. 6, italics added.)

Moreover, the Board's assessment jurisdiction emanates from article XIII, section 19, and is independent of any regulatory jurisdiction of the CPUC. As the Board explained in its State Assessment Manual, because its jurisdiction emanates from the California Constitution it has the right to determine its jurisdiction in the first instance: "[A]s a quasi-judicial, constitutional body, the Board has the right to determine its own jurisdiction in the first instance. In essence, this means that the Board has the right to pass on its own jurisdiction first, and that this determination will stand unless overruled by a higher legal authority. This power stems from other powers conferred on the Board in sections 11, 17, 18, and 19 of article XIII of the State Constitution that are quasi-judicial in nature and on the Board's status as an agency of constitutional origin." (State Bd. of Equalization, State Assessment Manual (Mar. 2003) p. 3.)

Thus, to the extent that the CPUC requires utilities regulated by them to be issued a CPCN, this has no relevance to the Board's jurisdiction under the California Constitution to *assess* nonregulated generation facilities as utilities. As the Board went on to explain in the State Assessment Manual, its assessment jurisdiction includes both regulated and unregulated utilities: "[T]he Board's assessment jurisdiction over property owned by various types of common carrier (i.e., transportation) and public utility companies extends both to those that are 'regulated' and those that are 'unregulated.' For example, section 19 of article XIII grants the Board jurisdiction to assess 'property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the state, and companies transmitting or selling gas or electricity.' In this passage, the word 'regulated' does not modify 'car companies' or 'companies transmitting gas or electricity.' Thus, the Board's jurisdiction does not extend to unregulated railway, telegraph, or telephone companies, but may extend to car companies and companies transmitting or selling gas or electricity whether or not such companies are regulated." (State Bd. of Equalization, State Assessment Manual, *supra,* pp. 3–4, fn. omitted.)

■ The Board's assessment jurisdiction extends to all entities that can be considered "public utilities" under article XIII, section 19, regardless of whether they are regulated by the CPUC.

## V. *Bill No. 81 Does Not Violate Proposition 13*

IEPA asserts that Bill No. 81, which added Revenue and Taxation Code section 721.5 and passed the Legislature by a simple majority vote, violates the terms of Proposition 13 because the change in assessment of independent electric generation facilities from the counties to the state effected a rise in the tax rate for these entities. We reject this contention.

Proposition 13 provides that: "From and after the effective date of this article, any changes in State taxes enacted for the purpose of increasing revenues collected pursuant thereto whether by increased rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature, except that no new ad valorem taxes on real property, or sales or transaction taxes on the sales of real property may be imposed."

■ Most fundamentally, IEPA's assertion that Bill No. 81 violates Proposition 13 fails because the California Supreme Court has held that Proposition 13's restrictions on taxation of real property have no application to the unit taxation of public utility property under article XIII, section 19. In *ITT World Communications, supra,* 37 Cal.3d at page 863, the California Supreme Court explained the Board's assessment of utility property as follows: "One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. [Citations.] It has long been recognized that 'public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole.' [Citation.] Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty)."

The high court continued: "The unit taxation of public utility property is effected in four general stages. First, the Board annually assesses all unitary property of each public utility, that is, all property that it uses in performing its function. [Citation.] In making this assessment, the Board uses the principle of unit valuation: it determines the value of the property as a whole,

rather than the value of any of the assets as parts of the whole; it does not assess each asset and then total up the valuation, but values the property as a unit, primarily through a capitalized earnings approach. Second, the owner of the public utility property is offered an opportunity to apply for corrections. [Citations.] Third, the Board transmits to the local taxing authority a roll showing the assessments against public utility property situated within its jurisdiction. [Citations.] In accordance with the principle of unit valuation, such assessments do not represent the value of the assets situated within that jurisdiction; rather, they represent the share of the value of the property as a whole that the Board has determined should equitably be allocated to the jurisdiction. Thus, after it has assessed the value of the property as a whole, the Board makes a formulary allocation that has little or no relationship to the actual fair market value of the particular assets situated within the jurisdiction. Fourth, the local taxing authority subjects the property so assessed to taxation at the rate fixed in its jurisdiction. [Citation.]" (*ITT World Communications, supra,* 37 Cal.3d at pp. 863–864, fn. omitted.)

 The California Supreme Court concluded from these facts that the Board's assessment of utility property could not be considered taxation of real property: "[U]nit taxation is properly characterized not as the taxation of real property or personal property or even a combination of both, but rather as the taxation of property *as a going concern.* First, what the Board assesses is the value of the public utility property as a going concern; it considers the earnings of the property as a whole, and does not consider, less still assess, the value of any single real or personal asset. Second, what the Board allocates to the local taxing authority is, again, a share of the value of the public utility property as a going concern; it makes a formulary allocation based on considerations of equity, and does not even attempt to match the allocation to the fair market value of the particular assets of the utility situated within the jurisdiction." (*ITT World Communications, supra,* 37 Cal.3d at pp. 864–865.)

 Finally, the high court concluded that because Proposition 13 only applied to taxation of real property, it was not applicable to assessment of utility property under article XIII, section 19: "[W]e conclude that article XIII A does not directly apply to unit taxation. First, the provision is limited by the ordinary and natural meaning of its words to the subject of real property taxation. Unit taxation, by contrast, is simply not real property taxation either in substance or in form. Second, the provision deals with the subject of real property taxation; if it were construed to relate to the subject of unit taxation as well, it might arguably contravene the single-subject requirement of article II, section 8, subdivision (d). Third, the provision requires assessment to be based on 1975–1976 value (or the value at the date of acquisition if the property is acquired after 1975–1976). Article XIII, section 19, however, authorizes the unit taxation of public utility property and, as an essential

aspect thereof, *annual* assessment based on the current value of the property as a going concern. [Citations.] If article XIII A were construed to require the assessment of public utility property to be based on its 1975–1976 value, it would *pro tanto* impliedly repeal article XIII, section 19. Yet '[s]o strong is the presumption against implied repeals that when a new enactment conflicts with an existing provision, "In order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first." ' [Citation.] Because article XIII A does not constitute a revision of the entire subject of taxation, but merely amends the Constitution on certain aspects of the subject of real property taxation, we cannot construe it to accomplish an implied repeal of article XIII, section 19." (*ITT World Communications, supra,* 37 Cal.3d at pp. 865–866.)

 Thus, because we have concluded that the electric generation facilities at issue in this litigation constitute public utilities, they are subject to article XIII, section 19's unit taxation, not the tax limits imposed by Proposition 13 on real property.

 Further, as the high court explained in *ITT World Communications,* article XIII, section 19 does not run afoul of Proposition 13 because it deals with *assessment,* not the amount of tax to be charged, and thus does not effect a change in the tax rate: "By requiring that public utility property be 'subject to taxation to the same extent and in the same manner as other property,' article XIII, section 19, does not impose a requirement of equal valuation between public utility and other property, but simply specifies that public utility property, after it has been placed on the local tax rolls, be levied on at the same *rate* as locally assessed property, instead of being subject to a special gross receipts 'in lieu' tax. In other words, this comparability requirement was not intended to apply to the *valuation* of public utility property, but only to its *taxation* after assessment. [¶] . . . Thus, the original language and structure of present article XIII, section 19, clearly separated the *assessment* of public utility property from the *taxation* of such property, and required only that the property be *taxed* equally with other property and not that it be *valued* on the same basis." (*ITT World Communications, supra,* 37 Cal.3d at p. 870.)

 IEPA's claim of a violation of Proposition 13 thus fails because Bill No. 81 did not make a change in the tax rate for electric generating facilities. Rather, it merely transferred the jurisdiction to *assess* certain electric generation facilities to the Board, under the Board's constitutional authority under article XIII, section 19. The court did not err in finding that Bill No. 81 did not violate Proposition 13.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Haller, J., concurred.